593 So.2d 234 (1991)
Sam BATLEMENTO, et al., Appellants,
v.
DOVE FOUNTAIN, INC., et al., Appellees.
No. 89-2460.
District Court of Appeal of Florida, Fifth District.
December 27, 1991.
Rehearing Denied February 21, 1992.
*236 Charles Evans Davis and Stephen P. Kanar, Orlando, for appellants.
Douglas C. Spears of Pleus, Adams & Spears, P.A., Orlando, for appellees.
GRIFFIN, Judge.
This is an appeal from a final judgment upon a jury verdict rendered in favor of plaintiffs/appellees Vito and Ida Maniaci (the "Maniacis") and Dove Fountain, Inc. (plaintiffs) for fraud, breach of contract, and violation of the Business Opportunities Act.[1]
This case arises from the Maniacis' purchase of a Casa Mia restaurant on Conway Road in Orlando, Florida in 1983. Casa Mia was a chain of primarily family-owned Italian restaurants which were located solely within the Orlando area. The chain was started by three brothers, Sam Batlemento, Luigi Badalamente and their brother Joe (now deceased). Many of the restaurants were operated by family members, but a small minority of the restaurants were operated by outsiders who frequently owned an equity interest. The remaining interests were owned by Casa Mia Pizzeria & Ristorante, Inc., a Florida corporation ("Casa Mia"), which in turn was owned by Florentes, Inc., a corporation owned in equal shares by the Badalamente brothers.
Appellee Vito Maniaci, a postal worker, who resided in Michigan, was a lifelong friend of the Badalamentes. Over the years he had invested in a number of different business ventures with the Badalamentes on which he had always made money. Among these ventures was a Big Boy restaurant and a duplex in the Orlando area. Since 1976, he had frequently visited Sam Batlemento and Luigi Badalamente in Orlando and the parties had discussed the possibility of Vito's participation in the Casa Mia business.
In the late 1970's, Casa Mia underwent expansion and the brothers allegedly decided to franchise the restaurants.[2] Either in anticipation of the franchise or Maniaci's retirement in 1986, talks concerning the Maniacis' purchase of a restaurant began to accelerate in 1983. In August, 1983, the Maniacis decided to send their twenty-one year old son, Dan Maniaci, to Orlando to learn the business by working in the existing Casa Mia restaurants.
By November 1, 1983, Vito had completed his investigation of various locations and had decided to purchase Casa Mia's existing Conway Road location. The restaurant was owned by Buona Fortuna, a corporation owned in equal shares by Casa Mia and University, Inc. University in turn was owned in equal shares by Casa Mia and Franco Ferrari (a son-in-law of one of the Badalamentes). The purchase price was $99,000. At the closing, on November 29, 1983, the Maniacis paid $33,000 down in cash and assigned the company two promissory notes totalling $8,000. The remaining balance of $58,000 was to be paid at the rate of 12% under the terms of the purchase money note given Buona Fortuna.
At the time of the sale, the Maniacis entered into a Management Agreement with Casa Mia. Under the terms of the agreement, the Maniacis agreed to pay Casa Mia five percent of gross sales in exchange for Casa Mia's management expertise, although no specific management responsibilities were set forth in the agreement.[3]
*237 The Maniacis took over the restaurant as of December 1, 1983 and operated it under the aegis of Dove Fountain, Inc., a corporate entity which controlled the restaurant until it closed in September of 1986. Although sales increased during the first year, the restaurant experienced financial problems from the first. The Maniacis made no provision for working capital, allegedly because this issue had never been raised by the Badalamentes. Also, the Maniacis had been told by appellants that operating expenses would approximate $13,000 per month but, in fact, they were $17,000 a month. Evidently, the Maniacis had not taken into account payment of the obligations under the purchase money note; also, it appears that Dan Maniaci was not an efficient manager. By April of 1984, the restaurant was in arrears over $12,000. Throughout 1984 and 1985, conditions in the restaurant continued to deteriorate. Appellees made sporadic payments under the note and for advertising, but eventually defaulted under their lease. The restaurant closed in September of 1986 and the equipment was sold in early 1987 for only $18,000.
In their Amended Complaint filed against appellants Sam Batlemento, Luigi Badalamente and Casa Mia, appellees sought damages for fraud, breach of the management contract, violation of Florida's Business Opportunities Act[4] and for civil redress of criminal practices.[5] Casa Mia counterclaimed for monies owed under the management agreement and Sam Batlemento counterclaimed for monies owed on various insurance policies he had carried for the Maniacis through Batlemento Insurance Co. Buona Fortuna also filed a third-party complaint to recover sums due under the purchase note and mortgage. The total amount allegedly due on the counterclaims and third-party complaint was in excess of $65,000.
The case was tried to a jury, which found in favor of plaintiffs on their claims for fraud, breach of contract and violation of the Business Opportunities Act. The jury awarded appellees $147,000 in compensatory damages and an equal amount for punitive damages. Following denial of their post-trial motions, appellants have appealed the final judgment asserting multiple claims of error.

I. FRAUD
Appellants argue that fraud was not properly pleaded, there was no evidence adduced at trial to support a judgment for fraud and that indeed, as a matter of law, the circumstances leading up to appellees' purchase of this business could not constitute fraud. We agree that the allegations contained in the amended complaint are completely inadequate to state a cause of action for fraud. The fraud allegations in the amended complaint were as follows:
8. Defendants, Sam Batlemento, Luigi Badalamente and Casa Mia made representations to Maniaci concerning the prior business history of the restaurant being offered, its prior income, its potential income, prospects, and the services that would be provided in support of the business by said Defendants.
9. Maniaci in reliance upon the representations of said Defendants entered into an agreement to purchase the Casa Mia Pizzeria and Ristorante... .
10. The representations made by Sam Batlemento, Luigi Badalamente and Casa Mia were false and known by said Defendants to be false at the time they were made. Specifically, the representations *238 as to the prior business history, potential income and services to be provided were false, contrived and without basis in fact.
11. Defendants, Sam Batlemento, Luigi Badalamente and Casa Mia made the aforesaid representations with specific intent that Maniaci rely on them to their detriment.
* * * * * *
23. The representations made by Defendants to induce Plaintiffs to enter into the agreement to acquire the business opportunity were false and fraudulent and known to be false and fraudulent at the time they were made.
24. Defendants intended that Plaintiffs rely upon said representations to their detriment.
25. With respect to representations as to services and support to be provided, Defendants made said representations and promises with no present intent to perform.
26. Defendants have specific knowledge of Plaintiffs' limited financial ability and weak financial condition. Nevertheless, Defendants made the representations with the specific intent to defraud Plaintiffs of their money.
27. Defendants' actions were willful, wanton and in reckless disregard of the rights of Plaintiffs entitling Plaintiffs to an award of punitive damages.
28. As a result of Defendants' representations, Plaintiffs have been damaged including, but not limited to, the loss of their initial investment, their continuing capital contributions and investments, loss of capital and assets, interest, lost profits and other monetary damages.
Florida Rule of Civil Procedure 1.120(b) requires that claims of fraud be pleaded with particularity. Particularity requires identifying the representation of fact and how the representation is false. Gordon v. Etue, Wardlaw & Co. P.A., 511 So.2d 384 (Fla. 1st DCA 1987). The fraud claim in the amended complaint does no more than identify the subject matter of the alleged false representations of fact. The trial court plainly erred in failing to require appellees' compliance with Florida Rule of Civil Procedure 1.120(b) by granting appellants' motion to dismiss. Nevertheless, we are unable to reverse on this basis.
After a favorable verdict for the plaintiff, a judgment is subject to reversal for defect in pleading only if the defendant has been prejudiced by the error. See Well-Bilt Products, Inc. v. Liechty, 167 So.2d 84 (Fla. 2d DCA 1964). Although the appellants claim the lack of factual content in the fraud claim left them ill prepared to defend the claimed fraud, we disagree. Appellants took the deposition of Mr. Maniaci early in the case and he identified his claims at that time, although by the time he testified at trial, they were considerably embellished. Nevertheless, if appellees had pleaded what Mr. Maniaci said in his deposition, the complaint would have properly withstood appellants' motion to dismiss. Also, we note that appellees were given leave to amend late in the case to add allegations to the business opportunity and conspiracy counts. These allegations expanded somewhat on Mr. Maniaci's claim that he had been told falsely the Casa Mia restaurants were about to be franchised and that his restaurant would increase in value as a result, which induced him to buy the business. As for the contention that appellees did not prove fraud, while we agree that certain of the misrepresentations testified to by the Maniacis could not support a claim of fraud,[6] we have found sufficient evidence in this record to create a jury question on the fraud issue.[7]

*239 II. THE BUSINESS OPPORTUNITY CLAIM
We reverse the final judgment on appellees' claim for violation of the Business Opportunities Act. Once again, as with the fraud claim, appellees failed to allege any facts that would give rise to violation of Chapter 559 of the Florida Statutes. Here, however, the defect is not merely a matter of pleading. We agree with appellants that the statute simply does not apply to the transaction in this case. The statute defines a "business opportunity" as the sale or lease of products, equipment, supplies or services sold to a purchaser to enable him to start a business under certain defined circumstances; however, the statute expressly excludes the sale of an ongoing business.[8] Appellees argue this exclusion for the sale of an ongoing business contemplated by the act does not encompass the situation involved here, where there is a continuing relationship between the parties, but we can find no basis to interpret the plain language of the statute as appellees suggest. It is also undisputed that Buona Fortuna, Inc. was the seller of this ongoing business to the Maniacis. Casa Mia simply contracted to provide management services. The prohibitions of the act apply to the seller of the opportunity, not the shareholders of the seller or individuals who act for the seller.[9] We conclude the Business Opportunities Act does not apply in the present case and, accordingly, reverse the judgment on this claim.

III. BREACH OF CONTRACT
Appellants also complain on appeal that judgment was entered jointly and severally against defendants Sam Batlemento and Luigi Badalamente, as well as Casa Mia on the breach of contract. From our review of the record, particularly appellants' motions for directed verdict at trial, we can find no mention of any lack of legal or evidentiary basis to hold the individuals liable for breach of contract. Moreover, counsel for both sides agreed to the form of the verdict used in this case. Surprisingly, the form did not distinguish between the individual or corporate defendants as to any count and contained no method for the jurors to apportion the amount of compensatory or punitive damages attributable to any defendant. Appellees contend the verdict form was actually prepared by appellants and that appellants' agreement to this verdict form waived any objection to a finding of joint and several liability of all "defendants" on the separate counts in accordance with the form. Appellants argue that a verdict against a party which is unsupported by evidence must be reversed even where there was no objection to its submission *240 to the jury.[10] From comments made by counsel during closing, it appears appellants were fully aware of this feature of the verdict form. We can only assume some trial strategy motivated use of this highly unusual form. We are unwilling to find fundamental error.

IV. EVIDENTIARY ISSUES
Appellants also complain that the trial court, in violation of the requirements of section 90.956, Florida Statutes (1989), permitted appellees to introduce a written damage summary consisting of all sums spent by the Maniacis on the Casa Mia restaurant. These expenditures totaled $102,110.29. Florida courts require strict compliance with the "timely written notice" requirement contained in this rule of evidence, especially where the record contains no evidence that the underlying data from which the summary was compiled was made available to a complainant. See Tallahassee Housing Authority v. Florida Unemployment Appeals Comm'n, 483 So.2d 413 (Fla. 1986). The failure to comply with the notice requirements of section 90.956 has been found to be a "technical" violation of the statute only where:
the record reflects that the written summary to which the witness referred and the data underlying the summary were in fact made available to the appellant sufficiently in advance of the presentation of this testimony so as to enable the appellant to adequately prepare to voir dire and cross-examine the witness.
Bowmar Instrument Corp. v. Fidelity Electronics, Ltd., Inc., 466 So.2d 344, 345 (Fla. 3d DCA), rev. denied, 476 So.2d 672 (Fla. 1985).
In this case, the summary was not provided to appellants prior to trial, which appellees admit.[11] Appellees contend that all underlying documentation was provided to appellants prior to trial and that the summary was "merely cumulative" because all items contained on the summary were otherwise in evidence. We cannot verify from the record whether all the underlying documentation was supplied before trial, but we have carefully reviewed the trial transcript and exhibits in an effort to confirm all the items on the summary were otherwise in evidence at trial. It appears that many items of claimed damage are not supported by evidence in the record other than the summary. The jury award was plainly based on this summary and any item proved only through the summary was improperly awarded as part of the damages. On remand, the compensatory damage award must be reduced by the damage summary amounts not otherwise proved by competent evidence.[12]

V. COMPENSATORY DAMAGES FOR FRAUD AND BREACH OF CONTRACT
Turning to damages, in this case appellees were awarded $147,000 in compensatory damages, computed as follows: the $102,000 in damages outlined in the summary, $7,914.93 for management fees paid to Casa Mia, $22,573.13 paid to Buona Fortuna, Inc. on the note and mortgage, and $14,666.62 spent on advertising for the restaurant, for total damages of $147,266.97. *241 As previously discussed, the verdict did not distinguish between damages assessed against any defendant for fraud, breach of contract or violation of the Business Opportunities Act. Having chosen to submit these damage issues to the jury without differentiation among the claims, appellants cannot now complain about it.
The proper measure of damages for fraud in this case presents a hard issue. Appellants have strenuously argued here, as they argued to the jury below, that appellees' damage theory, which includes all out-of-pocket expenses for the entire three-year period they operated the restaurant until it was sold, was erroneous, especially because Maniaci testified that he had become aware of appellants' alleged misrepresentations shortly after purchasing the restaurant. We agree in principle with appellants that a defrauded party cannot continue with an enterprise after he has discovered the fraud and expect to recover as damages the additional losses he incurs. But we do not believe the general rule would apply in this case. As part of the inducement to Maniaci to buy the business, Casa Mia undertook a continuing, undefined contractual duty to manage this restaurant: "Don't worry about a thing, we are down here. We can overlook everything that happens." Under the circumstances, we cannot say as a matter of law that appellees' efforts to make a go of the business was unreasonable.[13]See Thor Power Tool Co. v. Weintraub, 791 F.2d 579, 585 (7th Cir.1986). The jury had a full and fair opportunity to consider these damage issues and found in favor of appellees.

VI. PUNITIVE DAMAGES
Although analysis of this case has been complicated by appellees' various failures of pleading and proof and appellants' failure to object below to many of the errors of which it now complains, it turns out that the only issue that requires a new trial was also the most hotly contested below. Mr. Maniaci was permitted, over objection, to testify at some length during appellees' case in chief about the sources of the funds he used to purchase the Casa Mia restaurant. He described using "all his savings", cashing out his treasury notes and borrowing from his credit union and life insurance policies. He further testified about borrowing money from his family and mortgaging his home to keep the restaurant afloat. When the business closed, their finances were "very bad"; they had lost "everything".[14] The relevancy of the testimony, according to appellees, was to show, in support of the claims of fraud and punitive damages, that appellants "knew the effect it [presumably, the investment] was having on him and what it left him in the end." Appellants objected to all this testimony and moved for a mistrial, asserting the source of the funds appellees invested in the restaurant and how little or much money appellees had left was irrelevant and was offered only to inflame the jury because of the impoverishment of appellees.
The general rule is that during trial no reference should be made to the wealth or poverty of a party, nor should the financial status of one party be contrasted with the other's. Annotation, Counsel's Appeal in Civil Case to Wealth or Poverty of Litigants as Grounds for Mistrial, New Trial or Reversal, 32 A.L.R.2d 9 § 2 at 17 (1956). Argument directly contrasting the poverty of one of the parties with the wealth of the other is especially apt to prejudice the jury. Id. at § 5. In Florida, the admission of such evidence or commentary has often been held to constitute reversible error.[15] Although *242 in Florida the rule generally has been applied in personal injury actions, it has been applied in a wide variety of actions in other jurisdictions. Vanarsdol v. Farlow, 200 Iowa 495, 203 N.W. 794, 795 (Iowa 1925) (recognizing rule in context of fraud action); El Paso Dev. Co. v. Ravel, 339 S.W.2d 360 (Texas App. 1960). See generally 32 A.L.R.2d, supra at § 3 (1956).
Appellees argue the evidence concerning their own financial hardships was relevant to the jury's consideration of punitive damages.[16] In Florida, in determining the amount of punitive damages, the jury should examine the enormity of the offense and the finances of the party against whom damages are assessed. Horizon Leasing v. Leefmans, 568 So.2d 73, 75 (Fla. 4th DCA 1990). Presumably, the fact that appellants' misrepresentations induced a middle class person, with limited resources, rather than a wealthy person (who might not be so inconvenienced by the loss of his investment) to invest in this restaurant goes to the "enormity of the offense" or the "outrageousness of the conduct." We cannot agree that the financial status of the victim of a fraud is a relevant consideration in a jury's evaluation whether to punish a defendant with an award of exemplary damages. Certainly, if the situation were reversed, i.e., the appellees were enormously wealthy and the poverty-stricken appellants had sought to introduce this sort of "Robin Hood" defense in mitigation, the appellees would (properly) have objected with a vehemence comparable to the appellants' objections in this case.
Unfortunately, inherent in our system of trial by jury is always a danger the jury will be influenced by the wealth or power of one party or another or sympathy for a party's weakness, poverty or misery. Insurance companies, banks and large corporations would no doubt attest that verdicts are unduly affected by which party has the "deep pocket." It is essential to avoid this risk.
Here, the evidence objected to by appellants makes clear that, after this transaction, the Maniacis were left in dire financial condition. Worse yet, because of the evidence adduced in support of the punitive damage claim, which automatically flows in Florida from prima facie proof of fraud, the jury was informed that appellants were living in big expensive houses and had large holdings ("two million dollars"). We cannot follow appellees' reasoning that the fact that this tort exhausted all their resources, rather than some of their resources, is relevant to determination of a punitive damage award. Due to the well-recognized potential for such evidence to improperly skew the jury's deliberations, we conclude the punitive damage award cannot stand. Because the liability of appellants for fraud was not unequivocally established in this trial and because of the difficulty of determining that the liability verdict on the fraud claim was not influenced by the improper evidence adduced by appellees on the damages issue, appellants are entitled to a new trial both on liability and damages awardable on the fraud count.[17]See Rivera v. Aldrich, 538 So.2d 1390 *243 (Fla. 3d DCA 1989); Keith v. Russell T. Bundy & Assoc., Inc., 495 So.2d 1223 (Fla. 5th DCA 1986). We affirm the judgment against all defendants on breach of contract, but remand for recalculation of damages in accordance with section IV of this opinion. The judgment based on the violation of the Business Opportunity Act is reversed.

VII. COUNTERCLAIM
We see no error in the trial court's refusal to award damages on the counterclaim. In light of the parties' stipulation that the counterclaim damages would stand or fall with the liability and would be determined by the court and our ruling on the measure of damages on the fraud claim, as set forth above, the trial court correctly refused to award these damages to appellees.
AFFIRMED in part; REVERSED in part and REMANDED for new trial on fraud and punitive damages.
W. SHARP and COWART, JJ., concur.
NOTES
[1] Appellees also sued for violation of section 772.102, Florida Statutes (1989), but the jury found in favor of the appellants on this claim.
[2] According to the record, there were nine Casa Mia restaurants in existence in 1983. Only one was still in operation at the time of trial.
[3] The pertinent provisions of the agreement were as follows:

WHEREAS, Maniaci is engaged in the restaurant business; and
WHEREAS, Casa Mia is an organization composed of skilled members and engaged in managing various business enterprises; and
WHEREAS, Maniaci is in need of a skilled management organization to run its affairs;
NOW, THEREFORE, in consideration of the mutual benefits to be derived, each from the other, the parties hereto agree as follows:
Maniaci shall pay to Casa Mia five (5%) percent of gross sales; as hereinafter defined, realized from the store.
[4] § 559.80, et seq., Fla. Stat. (1983).
[5] § 772.11, Fla. Stat. (1989).
[6] We agree, for example, that appellees failed to establish fraud based on the representation that $13,000 monthly would cover all expenses of the restaurant because, in fact, it took plaintiffs more than $17,000 monthly to pay the expenses and the debt of the business.
[7] For example, appellants represented to Mr. Maniaci that they had filed with the State of Florida the documents necessary to franchise the Casa Mia chain, that when this occurred, the value of the restaurants would immediately double in value and that he should act quickly to get in on the ground floor. At trial, appellants denied these representations and testified that franchise approval was ultimately obtained in May, 1984, but there was no documentary evidence introduced and the jury evidently did not believe them. Appellants complain that the franchise misrepresentation was not pleaded at all in the amended complaint. However, the complaint does refer obliquely to misrepresentations concerning the "future prospects" of the restaurant  which further illustrates why specificity in pleading fraud claims is essential.
[8] Unfortunately, there is virtually no case law on the act. The legislative history suggests sale of this single Casa Mia restaurant, even with the attendant management agreement, use of Casa Mia recipes, formulae and menu, and purchase of some supplies is not the type of business intended to be controlled by the statute.

The definition of "Business Opportunity" includes those transactions where the seller represents to the buyer that the seller will provide either equipment, inventory, marketing locations or assistance, or that the buyer is "guaranteed" to derive a specified return over his initial investment in the opportunity. By example, such business opportunities include worm farms, chinchilla ranches, bubble gum vending machines, vitamin sales and numerous other programs that offer the buyer the opportunity to own and operate his own business, often inserting the phrase "in your spare time."
The definition specifically excludes marketing programs made in conjuction [sic] with the licensing of a registered trademark or service mark, or the sale of an ongoing business, as long as the seller does not sell more than five of the opportunities or businesses, or the not-for-profit sale of sales demonstration equipment or display samples for a total price of $500 or less. This "take out" provision excludes franchises and normal sales of marketing aids.
Senate Bill 1205, Commerce Committee, Legislative History.
[9] To address this problem an amendment to the amended complaint was filed alleging Casa Mia and the individual defendants were liable under an alter ego theory. However, there was no competent substantial evidence advanced at trial on this issue.
[10] The few existing cases on this issue appear to turn on a fundamental error analysis. See, e.g., Morrison v. Hansen, 213 So.2d 306 (Fla. 1st DCA 1968) (the submission to the jury of a verdict that stated an incorrect principle of law constituted fundamental error). See also 55 Am.Jur.2d Trial § 213 (1984); Papcun v. Piggy Bag Discount Souvenirs, 472 So.2d 880 (Fla. 5th DCA 1985) (failure to object to verdict  on issues not of a constitutional or fundamental character  constituted a waiver of defects contained therein); Gould v. National Bank of Florida, 421 So.2d 798 (Fla. 3d DCA 1982) (same); Robbins v. Graham, 404 So.2d 769 (Fla. 4th DCA 1981) (same).
[11] We reject appellees' further argument that appellants waived any objection to use of the summary by offering a summary themselves. Also, although no renewed objection was made when the summary was finally admitted, it was unnecessary since the court had reserved ruling on the issue when counsel had previously objected.
[12] By way of information to the parties, our review has yielded a total of $18,150.91 in claimed expenditures on the summary for which we can find no documentation.
[13] There are some items of claimed damage that would not be recoverable even under this broad "out-of-pocket" approach, including any out-of-pocket expense not reasonably necessary to keep the business in operation, such as parking tickets. These items are not recoverable in any event due to lack of proof in light of our ruling that the undocumented damages are not recoverable.
[14] Appellees' counsel also commented variously on appellees' finances: "[Mr. Maniaci] basically sacked his entire life savings to come up with the money for this investment."
[15] See, e.g., Seaboard Air Line Ry. v. Smith, 53 Fla. 375, 43 So. 235 (Fla. 1907) (reversal required because of plaintiff's argument in personal injury action that he was poor person who would be ward of county for the rest of his life if he did not recover damages, but damages would not be missed by defendant railroad); Rogers v. Myers, 240 So.2d 516 (Fla. 1st DCA 1970) (court reversed judgment for plaintiff in wrongful death action where counsel argued that action involved more than private dispute between parties; it also involved public's liability for welfare; amounted to improper appeal to jurors' self-interest and was highly prejudicial); Baggett v. Davis, 124 Fla. 701, 169 So. 372 (Fla. 1936) (plaintiff's testimony that he had no means of support for family other than wages was held improperly admitted because irrelevant and calculated to unduly arouse jurors' sympathy for plaintiff); Deese v. White Belt Dairy Farms, Inc., 160 So.2d 543 (Fla. 2d DCA 1964) (found trial court properly granted motion for new trial where improper testimony that plaintiff was compelled to work because she had no means of support for herself and infant child and was receiving no support from her former husband.)
[16] Many courts have held this error harmless where the record otherwise contained enough properly admitted evidence from which the jury could figure out the relative economic status of the parties. Our review of the record suggests no basis to apply such an analysis in the present case.
[17] Because the issues involved on the claim for breach of contract were entirely different and this evidence was never offered on the contract issue, we see no reason to disturb the verdict for breach of contract.