SAWAYA, J.
 

 Joshua Cascanet appeals the final judgment that awarded him only past medical expenses and lost wages as damages for the back injuries he suffered when his vehicle was hit from behind while he was stopped at a red light. Cascanet argues that (1) the trial court erred in allowing the defendants’ independent medical examiner to render opinions to the jury that were not contained in his report; and (2) the trial court abused its discretion in allowing defense counsel’s improper closing argument because, Cascanet contends, it curried sympathy from the jury for the young defendant.
 
 [1]
 

 The accident occurred when Cascanet’s car was hit in the rear by a car driven by Keri Ann Allen and owned by her father, John Allen. Cascanet was only twenty years old at the time and Keri Ann was only eighteen. Keri Ann’s car “subma-rined” under the rear of Cascanet’s car, lifting it, propelling it forward, and then dropping it to the ground. Keri Ann’s car was totaled and Cascanet’s car was damaged, but driveable. Cascanet sought emergency room help later that evening after suffering increased pain in his back and legs. It was discovered that Cascanet had suffered two bulging, herniated discs, with possible inclusion of a third.
 

 Cascanet’s subsequent course of treatment over the next few months included trigger point injections, which, he described, made him feel as though he were on fire. These helped for only two hours or so each time. His doctor referred him to a chiropractor, but those treatments were largely unsuccessful in alleviating his pain. A nerve conduction study, which
 
 *761
 
 involved the use of electrodes, was performed. This gave him some relief for a few days. However, the pain worsened and Cascanet was referred to a neurosurgeon, who performed a discogram, which involved inserting needles in each disc without anesthesia. The discogram was excruciatingly painful and recovery from that procedure took several weeks.
 

 Cascanet filed suit against John Allen and his daughter, Keri Ann. John’s liability was purely vicarious, based solely on his ownership of the vehicle Keri Ann was driving. John did not appear at trial. Keri Ann sat alone at the defense table with a lawyer who, unbeknownst to the jury, was hired by Keri Ann and John’s insurance company to defend them both in the suit.
 

 Cascanet testified that he still suffers pain from his injuries. He cannot sit or stand for long periods. He cannot do any strenuous activities and is in bed at 9:00 p.m. each night. He has been unable to continue with his hobbies (all mechanical things related to cars), and he could not continue to work as a technician at Sears because he could not lift. He has been employed for over a year as a supervisor at a Firestone store, where his duties do not require that he lift; he does, however, miss the hands-on work that he so enjoyed. The pain continues and, Cascanet testified, it has worsened over time. The choice of surgery is not one he wants to face, nor is it an option suggested by any of his doctors until he cannot take the pain any longer. He struggles with the pain and, occasionally, his boss will allow him to leave his position at Firestone early.
 

 Cascanet’s treating physician, Dr. Dat-ta, testified. Dr. Datta believes that Cas-canet will probably require surgery eventually because none of the nonsurgical treatments have provided lasting relief. Surgery is not to be entered into lightly, however, and the hope is that it can be postponed until Cascanet comes to him with the statement that he cannot go on like he is. Dr. Datta described that Cas-canet’s symptoms were significant enough to warrant the discography, which is “very painful” and is not undertaken unless surgery is being seriously considered. Performing the discogram is “generally the end of the road” and means that every nonoperative option has been exhausted and the next step is surgery. There was, he testified, a 90% probability that Cas-canet will need the surgery in the next ten years and a 50% probability that he will need the surgery in the next two-to-three years. Once Cascanet has the first surgery, more surgery will be required over time due to adjacent segment syndrome.
 

 After the plaintiff rested his case, the defense presented only one witness — Dr. Lawrence Robinson, an orthopedic surgeon the defendants had hired to perform an independent medical exam (IME) of Cascanet. Dr. Robinson examined Cas-canet on January 23, 2007, and prepared a written report. This report states that “[sjensation was diminished over the an-terolateral thighs bilaterally in a nonder-matomal distribution.... ” It further states that diagnostic studies reveal “disc herniation at the L4-5 level and disc protrusion/herniation at LB-4 also central with some accompanying secondary spinal stenosis.” The report goes on to state:
 

 Based on review of medical records and the patient’s history,
 
 Mr. Cascanet’s chronic back and radiating leg complaints likely are causally related to the motor vehicle accident in which he was involved on 9/29/05.
 
 He has been through an extensive course of therapy and passive treatment'and there is little further that can be offered from a conservative treatment standpoint. Certainly, completion of a series of lumbar
 
 *762
 
 epidural blocks focused on the left L5 nerve root and [sic] might allow some relief though the duration of the effect is unpredictable. He is a large man who is obese and weight loss effort would also be advisable. He should be doing a regular exercise program for lumbar and abdominal strengthening and stretching within his tolerance.
 

 Surgical treatment may eventually be indicated though I also would agree that postponing surgical treatment as long as possible is advisable. He may require lumbar discectomies and/or fusion. The long term prognosis for multi-level dis-cectomies and fusion, however, is guarded especially in a young, large patient. Return to heavy labor would be inadvisable.
 

 I am in agreement with continued conservative care with oral medicines to be taken occasionally for breakthrough pain.
 

 (Emphasis added). Five months after making this written report, Dr. Robinson prepared an addendum based on his review of additional medical records. In that addendum, he states:
 

 At Mr. Cascanet’s most recent office visit with Dr. Datta, his pain was indicated to be chronic and moderately severe. Conservative care with physical therapy had been ineffective, but epidural blocks reportedly had not been completed despite previous discussions to this effect. Mr. Cascanet was not interested in pursuing surgical options. Lumbar epidural blocks were recommended with follow-up after completion of injections.
 

 Based on my review of these additional records, my opinion has not changed. Mr. Cascanet’s back and leg complaints appear to be causally related to the motor vehicle accident in which he was involved on 9/29/05. My treatment recommendations also remain unchanged.
 

 Cascanet’s attorney did not depose Dr. Robinson after receiving these reports, which basically confirmed the diagnosis and prognosis of Cascanet’s doctors. At trial, before Dr. Robinson took the stand, Cascanet’s attorney made a motion in li-mine to ensure that the doctor’s testimony would not include any new opinions. Defense counsel agreed that it would not.
 

 Despite the concession made by defense counsel in the presence of the trial judge that Dr. Robinson would not offer opinions that were not contained in his report, Dr. Robinson was actually allowed to testify that “many studies” have shown that spontaneous recovery of the disc herniations was possible because disc herniations can heal themselves and that Cascanet might never require surgery. He was also allowed to testify, despite the opinion in his written report that attributed Cascanet’s thigh pain to the accident, that there were other possible causes of that pain. These new opinions were discussed and argued to the jury by defense counsel during his closing argument. But that was a portent of what Cascanet was to face from defense counsel’s closing argument.
 

 With the very young Keri Ann sitting alone at the defense table, her attorney was allowed to argue, over Cascanet’s objections, that there was “[n]o need to burden my client with some hundreds of thousands of dollars, if not $1 million worth of money they’re asking for here. Is it fair that she be burdened....” The argument continued:
 

 As I said, we think it’s fair to burden $23,000, whatever the medical bills were, that’s a fair burden to be placed here. Those are the bills in the past, those were the bills that were incurred at the scene to make this gentleman better off. Is it fair for a burden of $210, the 30 hours, six, seven dollars an hour? Abso
 
 *763
 
 lutely. But what it looks — the term come to mind is, kind of an old football term, “piling on,” you’ve heard.
 

 This system is designed to be fair, the system is designed to be reasonable, designed for justice, not just for him— and, fairly, it is for him, but it’s also justice for my client, also, folks. Absolutely, justice should be for her, because this is, too, her only day to have someone stand before you and try to present to you the evidence in a fair and reasonable way to make this fair and reasonable for what happened on a day that was a bad day for her as well.
 

 The jury retired and returned its verdict in two hours. It awarded Cascanet $23,764.57, which represented his past medical bills and lost wages. It awarded no future economic or non-economic damages and found that Cascanet had not sustained a permanent injury. Cascanet unsuccessfully moved for a new trial on the improper allowance of Dr. Robinson’s testimony revealing previously undisclosed opinions and defense counsel’s improper closing remarks. Cascanet appeals, arguing that these errors deprived him of a fair trial.
 

 We believe the trial court erred when it allowed Dr. Robinson to testify that there were other possible causes of the thigh pain Cascanet continued to feel and that spontaneous recovery of the disc herniations may occur. These opinions were not reflected in Dr. Robinson’s written IME report or his addendum and thus were not properly presented to the jury. Rule 1.360(b), Florida Rules of Civil Procedure, requires that “the party requesting the examination to be made shall deliver to the other party a copy of a detailed written report of the examiner setting out the examiner’s findings, including results of all tests made, diagnosis, and conclusions, with similar reports of all earlier examinations of the same condition.” This rule was promulgated to require disclosure of the opinions of expert witnesses who render IME reports so that the other side may take those opinions into account in preparing to defend or prosecute the case.
 
 Office Depot, Inc. v. Miller,
 
 584 So.2d 587, 589-91 (Fla. 4th DCA 1991). Allowing the IME expert to render opinions that are not contained in the report violates the purpose and spirit of the rule.
 
 Suarez-Burgos v. Morhaim,
 
 745 So.2d 368 (Fla. 4th DCA 1999),
 
 review denied,
 
 767 So.2d 461 (Fla.2000);
 
 Office Depot,
 
 584 So.2d 587;
 
 see also Tetrault v. Fairchild,
 
 799 So.2d 226 (Fla. 5th DCA 2001).
 

 In
 
 Suarez-Burgos,
 
 for example, the appellate court agreed with the trial court that a new trial was required because the IME doctor’s trial testimony was contrary to his written report. The court explained:
 

 Rule 1.360(b) requires the disclosure of all opinions and conclusions reached by the expert which the expert plans to testify to at trial. There is no requirement or need for the opposing party to take the deposition of every expert where the party has been provided a report pursuant to the mandatory requirements of Rule 1.360(b).
 
 Nor is it necessary to exhaustively question the expert to discover whether the expert has come to other significant opinions not expressed in the report.
 
 Indeed, such requirements would fuel the ever increasing cost of litigation.
 
 Thus, a litigant who receives a report of the examination conducted under the rule should be confident that the report lists all of the mayor conclusions of the examining expert. See Office Depot, Inc.,
 
 584 So.2d at 590. In this case, Dr. Mack opined at trial that the plaintiff did not suffer permanent injury as a result of the accident. This opinion was the most significant opinion in the case. Thus, the plaintiff could claim surprise under
 
 Binger v. King Pest Control
 
 as a result
 
 *764
 
 of Dr. Mack’s failure to include this opinion in his report.
 
 See
 
 401 So.2d 1310, 1314 (Fla.1981) (testimony of a witness can be excluded where witness was not disclosed causing surprise to opposing party);
 
 see also Department of Health & Rehabilitative Servs. v. J.B.,
 
 675 So.2d 241, 244 (Fla. 4th DCA 1996) (recognizing
 
 Binger
 
 applies equally to situations involving the presentation of an undisclosed change of opinion).
 

 [[Image here]]
 

 At trial, Dr. Mack for the first time unequivocally testified that the plaintiff received no permanent injury as a result of the accident in question in this suit. Moreover, he admitted that some of his conclusions were based on material he had seen just hours before testifying. We think that this modification could be viewed as either a reversal of prior opinions,
 
 or the admission of opinions not contained in the reports furnished pursuant to Rule 1.360(b). In either case, the plaintiff could claim surprise and prejudice, which would support the trial court’s order granting the renewed motion for mistrial.
 
 As such, appellants have failed to show that the trial court’s ruling was such a patent abuse of the broad discretion afforded to it that reversal of its ruling is required. We therefore affirm.
 

 Suarez-Burgos,
 
 745 So.2d at 370-72 (emphasis added).
 

 There was nothing in Dr. Robinson’s initial report or his addendum to alert Cascanet that Dr. Robinson would testify that discs heal themselves or that there were other possible causes of the thigh pain. Rather, the doctor’s reports unambiguously confirmed the diagnosis of herniated discs and reflected his opinion that Cascanet’s chronic back and leg pain were “likely causally related” to the car accident. Dr. Robinson even agreed that there was little more that could be offered Cascanet from a conservative treatment standpoint. To Cascanet’s surprise, Dr. Robinson testified at trial that there were other possible sources of the leg pain and that there had been studies showing that herniated discs could be reabsorbed. Just as in
 
 Suarez-Burgos,
 
 Cascanet’s attorney could not have been prepared to rebut or effectively cross-examine the doctor on his new theory for the leg pain or to attack the “many studies” showing instances of herniated disc re-absorption.
 

 Regarding the closing argument issue, the courts have consistently prohibited a party from currying sympathy
 
 from
 
 the jury for a favorable verdict and asking a jury to consider the economic status of either party or the potential impact a substantial verdict would have on a defendant.
 
 Samuels v. Torres,
 
 29 So.3d 1193 (Fla. 5th DCA 2010);
 
 Hollenbeck v. Hooks,
 
 993 So.2d 50, 51 (Fla. 1st DCA 2008),
 
 review denied,
 
 8 So.3d 358 (Fla.2009);
 
 State Farm Mut. Auto. Ins. Co. v. Revuelta,
 
 901 So.2d 377 (Fla. 3d DCA 2005);
 
 Padrino v. Resnick,
 
 615 So.2d 698 (Fla. 3d DCA 1992);
 
 Batlemento v. Dove Fountain, Inc.,
 
 593 So.2d 234 (Fla. 5th DCA 1991),
 
 review denied,
 
 601 So.2d 551 (Fla.1992). While Keri Ann was seated alone at the defense table, as she had been throughout the entire trial, the jury was asked to consider whether it was “fair” to “burden” her with a substantial damage award and that it was “a bad day for her as well.” This was nothing more than an attempt to conjure sympathy for the young defendant to reduce the damage award by improperly asking the jury to weigh the effect a substantial award would have on her while ignoring her absent father, who was also a defendant, and ignoring the fact that there was insurance coverage. This stratagem was successful, as demonstrated by the quick return of the jury verdict finding no permanent injury, when there was undisputed evidence of the two herniated lumbar discs and unchallenged testimony of
 
 *765
 
 Cascanet’s continued pain and prospects for the future. The impact this improper argument had on the jury is also readily discernable from the fact that the jury awarded Cascanet almost the exact amount defense counsel said was a fair burden for his client and by the jury’s failure to award any amount for future economic and non-economic damages, despite the uncontradicted evidence that Cascanet will need medical care in the future, including surgery, and Cascanet’s inability to perform the kind of work that he did in the past.
 

 We conclude that the combination of the errors in allowing the IME doctor to testify regarding new opinions not expressed in his report and allowing the improper closing arguments deprived Cascanet of a fair trial. Accordingly, we reverse the judgment under review and remand this case for a new trial.
 

 AFFIRMED in part; REVERSED in part; and REMANDED.
 

 ORFINGER, C.J. and PALMER, J., concur.
 

 [1]
 

 . Keri Ann Allen and her father, John, have cross-appealed. They argue that the court erred in finding Cascanet’s proposal for settlement ambiguous and in refusing to enforce it. We affirm as to that issue.