**ECLIPSE MEDICAL, INC., a Texas corporation and Horizon Medical Technologies, Inc., a Washington corporation; Plaintiffs,**

v.

**AMERICAN HYDRO–SURGICAL INSTRUMENTS, INC., a Maryland corporation; Davol Inc., a Delaware corporation; C.R. Bard, Inc., a New Jersey corporation, Defendants.**

No. 96–8532–CIV.

United States District Court, S.D. Florida.

Jan. 20, 1999.

James Ragen, Ragen & Cromwell, Seattle, WA, Peter A. Sachs, Jones Foster Johnston & Stubbs, West Palm Beach, FL, for Plaintiffs.

Robert Brochin, Scott Dimond, Morgan Lewis & Bockius, Miami, FL, for Defendants.

## ORDER GRANTING DEFENDANTS' SECOND MOTION FOR PARTIAL SUMMARY JUDGMENT

RYSKAMP, District Judge.

### I. INTRODUCTION

THIS CAUSE came before the Court upon the Second Motion for Summary Judgment (the "Motion") of Defendants American Hydro–Surgical Instruments, Inc. ("AHSI"), Davol Inc. ("Davol"), and C.R. Bard, Inc. ("Bard") (collectively, the "Suppliers"), seeking 1) final summary judgment under Fed.R.Civ.P. 56(a) on seven of the nine counts brought against the Suppliers by Plaintiffs Eclipse Medical, Inc. ("Eclipse") and Horizon Medical Technologies, Inc. ("Horizon") (collectively, the "Distributors"), 2) partial summary judgment under Fed.R.Civ.P. 56(b) on the Distributors' two remaining counts and 3) final summary judgment under Fed.R.Civ.P. 56(a) on the counterclaims brought by AHSI and Davol against the Distributors. [DE–154] The Distributors' filed a memorandum in opposition to the Motion (the "Response") to which the Suppliers filed a reply. This Court heard argument on the Motion on December 18, 1998.

### II. BACKGROUND

This is an action brought by two medical supply distributors against one of their suppliers and two affiliated entities, alleging breaches of contract, fraudulent inducement, breach of fiduciary duties, promissory estoppel, tortious interference with business relationships, and violations of two Florida consumer protection statutes. AHSI entered into a distribution agreement with Eclipse Medical, Inc. ("Eclipse") on November 1, 1994 and with Horizon Medical Technologies, Inc. ("Horizon") on December 23, 1994 (the two distribution agreements are identical with regard to the provisions that are the subject of the Motion, and are collectively referred to as the "Agreement"). The parties agree that the Agreement is a valid and binding contract. The Agreement granted Eclipse and Horizon the right to purchase from AHSI and then market and re-sell certain laproscopic irrigation medical equipment, which is specifically defined in the Agreement (the "Products"). The Agreement further provided that the grant of marketing and sales rights was applicable only within each Distributor's prescribed Territory, as specifically defined in the Agreement.

The Agreement contained two specific provisions relating to its duration. The

first, Section 3, deals with the "term" of the Agreement, and reads as follows:

This Agreement shall remain in effect for a term commencing on the date of this Agreement and ending on December 31, 1995 (the "Term"), subject to the renewal provisions of Section 4 and the termination provisions of Section 20.

The second provision relating to the duration of the Agreement is found at Section 4, and reads as follows:

If this Agreement is still in full force and effect at the end of the Term, it shall be automatically renewed at that time for an additional one-year period (the "Renewal Term"), unless terminated pursuant to Section 20. Except as otherwise specifically provided, the Renewal Term shall be on the same terms and conditions as the Term.

On December 31, 1996, the Court granted the Suppliers' first Motion for Partial Summary Judgment by ruling that the foregoing language regarding the Agreement's term is clear and unambiguous, and that, as a matter of law, the parties' Agreement expired on December 31, 1996. While this Court certified that ruling for immediate interlocutory appeal, the Distributors failed to timely appeal the order.

The Agreement also contained a comprehensive merger clause. At paragraph 33 the Agreement provides that "this Agreement reflects the entire agreement between the parties and cancels all prior agreements and commitments, verbal or written, between the parties." At paragraph 34 the Agreement provides that "this Agreement may not be modified or amended except in a writing signed by both parties." Finally, the Agreement discusses the nature of the parties' relationship. The Agreement provides in the fifth paragraph that the parties "are not joint venturers, partners, or agents of each other," and Recital B of the Agreement provides that "the parties intend that their relationship be that of independent contractors."

The Plaintiffs have throughout this litigation maintained that the Agreements, by their own language, renew annually assuming that the Distributors meet their purchase quotas. They claim that during their contract negotiations, AHSI's Philip Bambino, who negotiated the Agreements with the Distributors on behalf of AHSI, told them that their contracts would renew annually as long as they met their quotas. The principals of each of the Distributors, Tim Wynne ("Wynne") of Horizon and Tom O'Brien ("O'Brien") of Eclipse believed at the time of execution of the Agreement—and allegedly believe to this day—that their Agreement specifically provided that it was to be perpetually renewing, annually, subject to the Plaintiffs achieving their sales quotas. They further claim that it was Bambino's promise of a "long-lasting partnership" that induced them to execute the Agreements.

Plaintiffs also allege the existence of programs initiated by AHSI in response to competitive market pressure which were collectively known as the "On Loan Program." Under the On Loan Program, both AHSI and the Distributors contributed to the cost of certain capital equipment that was provided free of charge to the Distributors' hospital customers. The hospitals were allowed to keep this equipment in exchange for executing price protection agreements whereby the hospitals would purchase Products from the Distributors at pre-set prices. These agreements were entered into between the hospitals and the Distributors, and the vast majority of

those executed by Eclipse and Horizon contained provisions allowing for their termination by either 30 or 60 day notice. However, as long as the hospitals purchased the disposable Products, they were entitled to maintain possession of the capital equipment provided to them free of charge. While the Distributors contributed to the cost of equipment and entered into price protection agreements with hospitals even before the execution of the Agreement, the final version of the On Loan Program was allegedly formalized by AHSI's March 1995 "On Loan Memorandum."

Plaintiffs claim that the On Loan Program was a "partnership," primarily because AHSI and the Distributors "shared" in the cost of the equipment that was loaned to the hospitals. While the Distributors claim that they were partners with AHSI, however, it is undisputed that the parties never agreed to—and never did—share in profits or losses with one another, or indeed exchange profitability information. Nor did the Distributors file partnership tax returns.

Plaintiffs claim that, as with the Agreement itself, they were fraudulently induced into the On Loan Program by Bambino. Bambino allegedly told the Distributors that by participating in the program—which allegedly represented a modification of the Agreement—they would guarantee that AHSI would supply them with Product for the duration of any price protection agreement they entered. Moreover, the Distributors allege that their right to purchase and re-sell Products under the On Loan Program was not contingent upon their achieving any purchase quotas. They allegedly base this belief, again, on representations to this effect made to them by Bambino. Wynne claims Bambino made such representations to him prior to entering in to the Agreement, and O'Brien claims that these representations were made to him after Eclipse signed the Agreement but before the On Loan Memorandum was released.

In October 1995, AHSI was acquired by Bard, which merged AHSI for operations purposes with Bard subsidiary Davol (the "Merger"). Prior to that time, Davol had been a competitor of AHSI in the laproscopic suction irrigation market. The Merger allowed Davol access to AHSI's Products, which were considered by the parties to be superior to the products offered by AHSI's competitors. The Distributors claim that following the Merger, Davol began to sell Products directly to hospitals within the Distributors' exclusive territories in violation of the Agreement and allegedly in derogation Davol's common law duties to avoid unjustified interference with the relationships between the Distributors and their customers.

The Suppliers allege that following the expiration of the Agreement on December 31, 1996, both Eclipse and Horizon failed to pay the Suppliers for products purchased under the Agreement, leaving outstanding balances of $99,017 and $75,427, respectively. The Suppliers have asserted counterclaims for breach of contract seeking these amounts, plus prejudgment interest and attorney's fees.

## III. STANDARD FOR SUMMARY JUDGMENT

"Summary judgment is proper if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Swain v. Hillsborough County Sch. Bd.*, 146 F.3d

855, 857 (11th Cir.1998). *See* Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "To defeat a motion for summary judgment, the nonmoving party may not rely on 'mere allegations' [but] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." *LaChance v. Duffy's Draft House, Inc.,* 146 F.3d 832, 835 (11th Cir.1998). Summary judgment is appropriate "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Williams v. Vitro Servs. Corp.,* 144 F.3d 1438, 1441 (11th Cir.1998). In considering a summary judgment motion, the Court must view the facts in the light most favorable to the nonmoving party. *See Id.See also Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

## IV. DISCUSSION

Seeking more relief than their Agreement provides, the Distributors have turned a breach of contract action into a nine-count complaint claiming virtually every cause of action that could possibly be asserted where an action for breach of contract would not lie. Plaintiffs' goal in each such count appears to be the creation of liability for the Suppliers beyond the December 31, 1996 expiration of the parties' Agreement. Moreover, in addition to maintaining that the Agreement itself provided for renewal beyond 1996, Plaintiffs assert that the parties amended their contract to create an obligation for the Suppliers to sell Product to the Distributors in 1997 and beyond. The Suppliers are entitled to summary judgment on all of the non-contractual counts of the Second Amended Complaint, and are further entitled to a narrowing of the remaining contract counts such that Plaintiffs may not seek damages for alleged breaches of contract occurring after December 31, 1996. The Suppliers are also entitled to summary judgment on their counterclaims against the Distributors, who admit that they purchased Products for which they have not paid.

### A. The Fraudulent Inducement Claims

Following this Court's ruling that the Agreement expired on December 31, 1996 the Plaintiffs amended their Complaint to allege four counts of fraudulent inducement and negligent misrepresentation relating to the Agreement and AHSI's On Loan Program. This Court dismissed all four of these counts, holding that the Distributors could not maintain claims for fraud based on AHSI's allegedly broken promises of future action without an allegation that AHSI knew of the falsity of the promises at the time they were made. The Distributors then amended their Complaint a second time to rely on two counts of fraud in the inducement based on the allegation that AHSI knowingly lied to induce the Distributors into both the Agreement and the On Loan Program. These fraud claims are defective as a matter of law.

#### 1. Fraud in the Inducement of the Agreement

█ Plaintiffs claim that the Agreement itself was induced by fraudulent statements made by AHSI's Bambino.[1] According to the Complaint, "AHSI made

---

**1.** The elements of fraud in the inducement in Florida are: 1) that the defendant misrepresented a material fact, 2) that the defendant knew or should have known that the state-

false statements and gave false assurances to the Distributors that AHSI intended and agreed to a long-term relationship with the Distributors, subject to satisfactory sales performance; that AHSI would not use the Distributors to develop the market for its products and then take the business directly by replacing the Distributors with a direct sales force; and that it agreed not to replace the Distributors for any reason except for lack of performance." Complaint ¶ 4.2. It is these representations regarding the "long-term," performance-based duration of the parties' relationship that allegedly induced the Distributors to enter into the Agreement. *Id.* ¶¶ 4.4, 4.5. While the Distributors argue that AHSI's alleged misrepresentations did not relate solely to the duration of the Agreement, the relief the Plaintiffs seek relates only to the alleged promise to extend the parties' relationship beyond 1996. It is thus clear that the purportedly false statements that form the basis of Count I relate solely to the duration of the Agreement.

 While the Distributors thus claim to have been induced into the Agreement by Bambino's false statements regarding the duration of the Agreement, the clear and unambiguous language of the Agreement itself specifically contradicts any of Bambino's alleged misstatements on this point. For a variety of reasons, Florida courts have made clear that no action for fraud in the inducement will lie where the alleged fraud contradicts the subsequent written contract. First and foremost, this District has clearly held that reliance on fraudulent representations is unreasonable

as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement. *Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1428 (S.D.Fla.1996); *see also Acquisition Corp. of Am. v. FDIC*, 760 F.Supp. 1558, 1561 n. 6 (S.D.Fla.1991). Indeed, fraudulent inducement claims will fail even where the subsequent contract simply says nothing about the allegedly false promise. The *Barnes* court held that "it is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties." *Barnes*, 932 F.Supp. at 1428.

The *Barnes* court thus focused both on the absence of the alleged promise and the fact that the alleged promise was contradicted by the written agreement. "[T]his Court finds that [plaintiff's] reliance on the terms of the July 21 letter was unreasonable as a matter of law because the terms of the letter contradict the terms of the Franchise Agreement and because the representations in the July 21 letter were not contained in the subsequent written Franchise Agreement between the parties." *Id.See also Schubot v. McDonalds Corp.*, 757 F.Supp. 1351, 1356 (S.D.Fla. 1990), *aff'd*, 963 F.2d 385 (11th-Cir.1992) ("Any reliance on the defendants' alleged misrepresentations is unreasonable because the statements were not contained in the subsequent written agreement"). Other courts have expressed this same concept in terms of the materiality of the alleged fraud, i.e., if the representation was not important enough to make it into

---

ment was false, 3) that the defendant intended the representation would induce the plaintiff to enter into a contract or a business relation; and 4) that the plaintiff was injured by acting

in justifiable reliance on the misrepresentation. *Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1425 (S.D.Fla.1996).

the comprehensive written agreement, it must not have been material. *See e.g. Saunders Leasing System, Inc. v. Gulf Central Distribution Ctr., Inc.,* 513 So.2d 1303 (Fla. 2d DCA 1987), *rev. denied,* 520 So.2d 584 (Fla.1988).

▮ In addition, as this Court ruled in granting the Defendants' first Motion for Partial Summary Judgment, all evidence relating to any alleged promises made by Bambino prior to the execution of the Agreement is barred by the application of the parol evidence rule, which forbids a party from providing evidence of prior or contemporaneous representations to vary or contradict the clear and unambiguous terms of a contract. *Acquisition Corp.,* 760 F.Supp. at 1561. *See also Typographical Serv., Inc. v. Itek Corp.,* 721 F.2d 1317, 1320 (11th Cir.1983) (no relief for oral misrepresentation where specific points covered in contract); *Greenwald v. Food Fair Stores, Corp.,* 100 So.2d 200, 202 (Fla. 3d DCA 1958) (same). It is clear that the effect of introducing such promises here would be to vary the terms of the parties' Agreement.

▮ The reasoning behind these basic principals of contract law should be all the more compelling where, as here, the alleged misrepresentation is based on a promise of future conduct. It is patently unreasonable for the Distributors to rely on a promise that the Agreement would be renewed annually *ad infinitum* based on performance where the Agreement specifically and unambiguously creaies only a single renewal term based on performance. This Court has already determined that

the Agreement's provisions pertaining to its duration are clear and unambiguous, therefore any claims based on Bambino's alleged representations of a different duration simply cannot, as a matter of law, be considered.

Notwithstanding the aforementioned citations of law, Plaintiffs maintain that Florida law allows claims for fraud in the inducement even where the allegedly inducing promise is contrary to specific and unambiguous provisions of the ensuing contract. In support of this proposition, Plaintiffs cite *Wilson v. Equitable Life Assur.,* 622 So.2d 25 (Fla. 2d DCA 1993), a case addressing an alleged fraudulent inducement into an employment contract. However, *Wilson* did not involve a misrepresentation that directly contradicted specific language of the contract that the fraud allegedly induced. The contract at issue in *Wilson* "simply has no explicit language discussing or foreclosing the possibility of a future arrangement as an agency manager with a guaranteed salary." *Id.* at 28. In fact, the *Wilson* court recognized the case law that held that "a party cannot maintain an action in fraud if the alleged misrepresentation is explicitly contradictory to a specific and unambiguous provision in a written contract." *Id.,citing FDIC v. Hemmerle,* 592 So.2d 1110 (Fla. 4th DCA 1991), *rev. denied,* 601 So.2d 552 (Fla.1992). Rather than rebut the Suppliers' authority on this point, the *Wilson* opinion reinforces it.[2]

Plaintiffs also offer *Golden v. Mobil Oil Corp.,* 882 F.2d 490 (11th Cir.1989) in support of their position. However, *Golden* involved a defendant's misrepresentation

---

2. It should also be noted that the merger provision applicable in *Wilson* did not void all additional promises made during negotiation as did the instant merger provision. The *Wil-*

*son* court specifically limited its ruling to the narrowly drafted merger clause before it. *Id.* at 28 n. 2.

regarding the possibility that a contract of an agreed-upon term would be renewed, such that the alleged misrepresentation did not directly contradict the terms of the agreement. Plaintiffs here claim, however, that Bambino misrepresented that the Agreement itself contained a perpetual renewal provision. The Distributors' claim is not that the Agreements last for two years but that new contracts would thereafter be forthcoming. Rather, Plaintiffs claim that Bambino told them that their Agreements themselves renewed annually and perpetually assuming performance. In fact the Agreement clearly and unambiguously said that it renewed once and then ended. Because the contract here flatly contradicts the alleged misrepresentation, this claim cannot stand.[3]

Plaintiffs' citation to *Jacobs Mfg. v. Sam Brown Co.*, 19 F.3d 1259 (8th Cir.1994), *rev. denied,* 513 U.S. 1190, 115 S.Ct. 1251, 131 L.Ed.2d 133 (1995), a case they claim to be "on all fours" with the immediate action, is even more inappropriate. The *Jacobs* court held that "in a Missouri fraud case, it is for the jury to decide whether a party is entitled to rely on verbal representations that conflict with a written agreement." *Id.* at 1264. While the Plaintiffs contend, without support, that Missouri law "is identical to Florida's law on fraud," quite obviously it is not. The quoted statement is completely contrary to Florida law as stated in *Barnes* and *Acquisition Corp.*, and does not control in this District.

Plaintiffs also cite to a series of cases concerning the concept of "subjective" reli-

ance in support of their argument that Florida law allows a claimant to rely on misrepresentations that directly contradict a subsequent written agreement allegedly induced by the statements. They primarily focus on *Besett v. Basnett,* 389 So.2d 995 (Fla.1980) for the proposition that a plaintiff may rely on the truth of a representation unless she subjectively knows that it is false or its falsity is obvious to her subjectively on a cursory examination. However, *Besett* discusses the extent to which a party may rely on a false statement of fact without taking steps to investigate the truth of the statement. In *Besett* the Plaintiff allegedly relied on the truth of statements regarding the size of a resort-lodge investment, the lodge's previous amount of business and availability of additional land for expansion—all factual matters. Here the Plaintiffs allegedly relied on a statement regarding AHSI's intent to act in the future, a topic not subject to investigation. Equally inapposite is Plaintiffs' reliance on *Chris Berg v. Acme Mining,* 893 F.2d 1235 (11th Cir.1990), another case where the Court refused to require a plaintiff to investigate the truth of a factual assertion—in that case the condition of the bottom of a lake—as a prerequisite to a claim for fraud in the inducement. In short, these cases simply say nothing about a Plaintiff's right to rely on a promise that is directly contrary to the contract that the promise allegedly induced.[4] When it comes to the unambiguous language of a written contract, there is no "objective" and "subjective" reading

---

3. *Elmore v. Vatrano,* 485 So.2d 888 (Fla. 1st DCA 1986) is also inapposite. That case dealt with the admission of parol evidence, and summary judgment was rejected where the defendants argued that the weight of their testimony outweighed that of the plaintiff. The Suppliers make no such argument.

4. Neither does *Telesphere Int'l. v. Scollin,* 489 So.2d 1152 (Fla. 3d DCA 1986), *rev. denied,* 500 So.2d 546 (Fla.1986) aid the Distributors. That case did not address a claim based on allegedly fraudulent statements that directly contradicted a written contract.

of the language, there is only the correct reading of the language. If a party to a contract could claim that prior representations directly contradictory to the contract induced her to sign it, and that by her "subjective" reading the contract said the opposite of what it did say, no contract would ever be dispositive of the parties' intent.

■ Plaintiffs' claim that the Agreement was induced by false promises is also barred by Florida's Statute of Frauds, which provides in pertinent part: "No action shall be brought ... upon any agreement that is not to be performed within the space of one year from the making thereof, ... unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by him or her thereunto lawfully authorized." § 725.01, Fla. Stat. (1993). As the court explained in *Hesston Corp. v. Roche*, "the purpose of the statute of frauds is to intercept the frequency and success of actions based on nothing more than lose verbal statements and mere innuendo." 599 So.2d 148, 152 (Fla. 5th DCA 1992). For this reason, the Statute of Frauds "should be strictly construed to accomplish its purpose." *Rowland v. Ewell*, 174 So.2d 78, 80 (Fla. 2d DCA 1965). Here the Plaintiffs allege that they were promised a long-term, perpetually renewing relationship, i.e., one at least longer than the two-year deal that the Distributors resist. As such, Plaintiffs' fraud counts pertain to promises which the Statute of Frauds requires to be made in writing.

■ Indeed, Florida law explicitly prohibits a plaintiff from reformulating an oral contract as a misrepresentation for the purpose of avoiding the Statute of Frauds. *See Ostman v. Lawn*, 305 So.2d 871 (Fla. 3d DCA 1974). The way a plaintiff fashions a claim does not determine the applicability of the Statute. Because the Statute "bars any claim which requires as its gravamen, proof of a promise or agreement" not reduced to writing, "[t]here is no distinction between an action *ex contractu* and an action *ex delicto* in this regard." *Id.*, at 872. As the *Ostman* further held, "The Florida rule is that the statute of frauds may not be avoided by a suit for fraud based on oral representations." *Id.See also Ashland Oil, Inc. v. Pickard*, 269 So.2d 714 (Fla. 3d DCA 1972) *cert. denied*, 285 So.2d 18 (Fla.1973); *Canell v. Arcola Hous. Corp.*, 65 So.2d 849, 851 (Fla.1953).

Thus, the Distributors cannot avoid the Statute of Frauds merely by claiming that an oral agreement was actually a fraudulently made promise to perform. Facing an identical situation in *Canell v. Arcola Hous. Corp.*, 65 So.2d 849, 851 (Fla.1953), the Florida Supreme Court held that "While it is contended by plaintiffs that they are suing for damages for fraud and deceit, such an action under the circumstances of this case is simply an attempt in an indirect manner to obtain damages for breach of the contract. Since the provision in the statute prohibiting any action to be brought on oral contract within the statute includes actions based indirectly on the contract, 'an action for damages cannot be maintained on the ground of fraud in refusing to perform the contract, even though the defendant at the time of the making of the oral contract may have had no intention of performing it.' " Citations

omitted.[5] Florida law is clear that "the statute of frauds cannot be circumvented by suing for fraud when the action is predicated upon an oral agreement unenforceable under the statute of frauds." *Ostman*, 305 So.2d at 872.

Plaintiffs suggest that even if the Statute of Frauds applied, a "performance exception" to the Statute exempts them from its requirements. But Florida courts have uniformly held that the "performance exception" to the Statute of Frauds, which arose in sale of land cases, applies only when a plaintiff seeks purely equitable relief. *See Elsberry v. Sexton*, 61 Fla. 162, 54 So. 592 (1911). In the cases cited by the Distributors, the plaintiffs were seeking the equitable remedy of specific performance of their contracts. Here, Plaintiffs seek purely legal relief in the form of lost profits. Because Plaintiffs here seek to obtain a remedy at law rather than equity, the part performance exception does not apply, and their claims are barred by the Statute of Frauds.[6]

Finally, although the application of Florida's economic loss rule to claims of fraudulent inducement is less than formulaic, under the standard recently articulated by Florida's courts the Distributors' tort claims must be barred. As one Florida court has noted, "[A]lmost any contract claim can be framed as a fraud in the inducement action ..." *Puff 'N Stuff of Winter Park v. Bell*, 683 So.2d 1176, 1179 (Fla. 5th DCA 1996). Florida's Fourth District Court of Appeal recently explained that "the supreme court [has] recognized .. that some fraudulent inducement claims are barred by the economic loss doctrine ... [t]he distinction between fraud in the inducement and other kinds of fraud is whether the fraud is extraneous to or interwoven with the breach of contract." *Greenfield v. Manor Care Inc.*, 705 So.2d 926, 932 (Fla. 4th DCA 1997), *rev. denied*, 717 So.2d 534 (Fla.1998). Applying this reasoning to a fact pattern similar to this one, the Third District Court of Appeal held that "a critical distinction must be

**5.** In *Roberts Co., Inc. v. P.B.O. Ltd.* the court addressed this issue directly when it held that "[t]he tortious conduct alleged in count II is predicated upon defendant's breach of an oral promise to convey realty and the Statute of Frauds has been held to bar such tort actions and, in essence, these actions are an attempt to recover for breach of an unenforceable contract." 322 So.2d 633, 633–34 (Fla. 3d DCA 1975).

**6.** The Florida Supreme Court enunciated the "performance exception" to the Statute of Frauds when it held that a party who has performed some or all of his duties under an oral contract for the sale of land may bring an action in equity to enforce the sale agreement. *Id.* In Florida, a suit seeking payment due pursuant to an oral agreement containing a term requiring payment in return for goods or services seeks equitable relief in the form of specific performance. *Burke v. Napieracz*, 674 So.2d 756 (Fla. 1st DCA 1996)(sale of home). For example, if Plaintiff delivers title to land for which Defendant has orally agreed

to pay $25, and then sues for the unpaid $25, he is seeking specific performance of the sale agreement, and the equitable nature of the relief may take the agreement outside of the Statute of Frauds. Since *Elsberry*, some courts have expanded the performance exception to include oral agreements other than those for the sale of land. However, every court that has allowed the exception has explicitly done so only in cases at equity when the relief sought was specific performance in the form of payment due under the oral agreement. *See Hiatt v. Vaughn*, 430 So.2d 597 (Fla. 4th DCA 1983)(employment contract); *Venditti–Siravo, Inc. v. Hollywood*, 418 So.2d 1251 (Fla. 4th DCA 1982)(agreement to pay taxes); *Gerry v. Antonio*, 409 So.2d 1181 (Fla. 4th DCA 1982)(construction agreement); *Shaffer v. Ricci*, 603 So.2d 566 (Fla. 4th DCA 1992)(employment agreement); *Av–Med, Inc. v. French*, 458 So.2d 67 (Fla. 3d DCA 1984)(employment agreement); *Collier v. Brooks*, 632 So.2d 149 (Fla. 1st DCA 1994)(employment agreement).

made where the alleged fraudulent misrepresentations are inseparably embodied in the parties' subsequent agreement. This would seem especially so where the parties have specifically agreed in an integration clause that their written contract 'supersedes all prior agreements or understandings.'" *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.,* 694 So.2d 74, 77 (Fla. 3d DCA 1997), *rev. denied,* 700 So.2d 685 (Fla.1997) (citations omitted). "Where the only alleged misrepresentation concerns the heart of the parties' agreement, simply applying the label of 'fraudulent inducement' to a cause of action will not suffice to subvert the sound policy rationales underlying the economic loss doctrine." *Id.*

There can be no doubt that the alleged misrepresentations here—both as to the Distribution Agreements and the on loan program—"concern the heart of the parties' agreement." The length of the distribution contract and the extent to which quotas do or do not apply are two of the most essential and material terms of the Agreement. As such, Bambino's alleged misrepresentations relate solely to core terms of the subsequent agreements, and allowing the Distributors to recover purely economic damages in tort for alleged breaches of such promises plainly violates the principals underlying the economic loss rule.

### 2. Fraud in the Inducement of the On Loan Program

■ As a matter of law and undisputed fact, neither Plaintiff could have relied on an alleged promises in entering into AHSI's On Loan Program. As to Plaintiff Horizon, Bambino allegedly told Wynne before Horizon's Agreement was signed that AHSI was bound to sell the Distributors' Products sufficient to supply hospitals which had signed price protection agreements for the duration of such agreements, plus extensions thereof, whether or not Horizon met its quotas. Bambino allegedly encouraged Horizon to get all its customers to sign such contracts. Thus, the alleged misrepresentation, made prior to the execution of the Distribution Agreement, directly contradicted both the term provisions and the quota provisions of the Distribution Agreements. Rather than an obligation by AHSI to sell Horizon products for two years with quota requirements, Wynne claims that before he signed the Agreement he was promised that AHSI would be required to sell Products to Horizon for however long Horizon could sign up hospitals to price protection agreements and renew such agreements, with no requirement that Horizon achieve quotas in order to preserve this entitlement. For the reasons discussed above, Horizon could not have relied on a representation that was directly contrary to the Agreement.

■ As to the Plaintiff Eclipse, that Distributor was engaged in the very behavior that allegedly demonstrated its reliance on Bambino's alleged representations—namely, investing in on loan equipment and entering price protection agreements—well before the representations were even made. According to Plaintiffs' allegations, Bambino made the on loan misrepresentations in early 1995, after the 1994 Distribution Agreement was executed and well after Eclipse had begun to execute hospital agreements and make contributions to on loan equipment. As a matter of law, Eclipse could not have relied on the alleged representations in deciding whether to participate in the On Loan Program. In sum, as to Plaintiff Eclipse, it is clear that no mis-

representation caused it to participate in the On Loan Program, and summary judgment will be entered as to Count II.

Moreover, as discussed above, both Plaintiffs' claims of fraud in the inducement of the On Loan Program violate both the Statute of Frauds and the economic loss rule. Any fraudulent statements concerning AHSI's alleged promises to extend the Agreement by way of the hospital price protection agreements amounts to an unenforceable promise for AHSI to supply products for years in the future with no quota requirements. As discussed below, no writing evidences such an amendment to the Agreement, and enforcement of such a promise is thus barred by the Statute. In addition, Distributors cannot travel under a fraud theory to prove economic damages under facts that are interwoven with—and in this case identical to—the alleged breaches of contract. Count Two is nothing more than a restatement of the claim that the Suppliers breached their "mutually agreed upon modifications to the Distribution Agreement made pursuant to the 'On Loan' program . . ." Complaint ¶ 6.2. As such, it is not a claim based on independent tort allegations, but rather it would be proved by facts identical to those allegedly supporting Plaintiffs' contract claims. The alleged falsehood underlying this claim "concerns the heart of the parties' agreement," and is therefore barred by the economic loss rule. *Hotels of Key Largo, Inc.,* 694 So.2d at 77.

### B. The Distributors' Claim for Breach of Fiduciary Duty

 Plaintiffs attempt to state a cause of action for breach of fiduciary duty based on the "partnership relationships" or other general fiduciary obligations existing between them and the Defendants. However-er, by its specific language, the parties' Agreement clearly and unambiguously disavows the existence of any partnership or other fiduciary relationship between the parties. Moreover, as explained in *Anthony Distributors, Inc. v. Miller Brewing Company,* 882 F.Supp. 1024, 1031–32 (M.D.Fla.1995), "the majority view of courts having addressed the issue is that the parties to a distributor agreement stand at arms length and no fiduciary duty exists." Because this type of relationship does not create fiduciary duties, and because these parties specifically foreclosed the existence of a fiduciary relationship in their Agreement, Plaintiffs allege that the On Loan Program represented a modification of the Agreement whereby a partnership was formed. Their claim that the On Loan Program had such an effect is based primarily on the fact that the parties "shared" in the cost of equipment provided to the Distributors' hospital customers.

 The undisputed evidence makes clear that no "partnership amendment" was ever effectuated by the parties. Any modification to the Distribution Agreement—including by course of conduct—would have to meet Florida's legal partnership criteria as expressed in *Dreyfuss v. Dreyfuss,* 701 So.2d 437, 439 (Fla. 3d DCA 1997). At very least Florida law requires the Plaintiffs to demonstrate a "right to share in the profits, and duty to share in any losses which may be sustained" as a result of the enterprise. *Id.* As the *Dreyfuss* court held, "These requirements are strictly construed and the absence of even one is fatal to the finding of a partnership." *Id* at 439. It is clear, based on the undisputed evidence, that the Plaintiffs have not met the *Dreyfuss* criteria. These parties never shared profits or losses and had no duty to do so. Plaintiffs

argue that the fact that the parties both pursued sales to customers and both benefitted from such sales constitutes the profit "sharing" required by Florida law. This allegation is plainly insufficient to establish a "right to share in the profits, and duty to share in any losses." *Id.* Indeed, under Plaintiffs' view, almost any contract would satisfy this partnership criterion because both parties would intend to benefit financially, and therefore a sharing in profits and losses could be implied.

Further, as discussed in more detail in the portion of this order addressing the Plaintiffs' contract claims, there is insufficient evidence to conclude that the Agreement was ever modified as the Plaintiffs allege. The Distributors can point to no document specifically purporting to amend or modify the Agreement in any way—much less one reversing the Agreement's repeated disavowal of a partnership relationship—that satisfies the Agreement's requirement that any modification or amendment be signed by both parties. For example, the On Loan Memorandum upon which the Distributors so heavily rely does not so much as hint that it modified the Agreement to create a contractual partnership. The Distributors also point to correspondence and memoranda from AHSI's sales department that use the word "partner" or "partnership" in referring to the Distributors. There is no evidence that this use of the word "partner" was intended by AHSI's employees to have a technical, legal meaning rather than simply representing a colloquial effort to foster team spirit. Most significantly, the

documents themselves make no mention of any modification—the very writings that the Plaintiffs claim "modified" the explicit Agreement do not indicate that they do so.

Finally, the Plaintiffs do not dispute that the basic aspects of the On Loan Program existed prior to the execution of the Agreement, as did the aforementioned use of the word "partner." As such, it strains the credulity of this Court to conclude that these programs represented a modification of the parties' subsequent Agreement. Thus, the parties' Agreement clearly forecloses the existence of a partnership or other fiduciary relationship, and the facts adduced during discovery make clear that no legal partnership was ever thereafter created between the parties. In the absence of such a partnership, the Suppliers owed no fiduciary duties to the Distributors, and this count is ripe for summary judgment.

## C. The Distributors' Promissory Estoppel Claim

■ The Plaintiffs next attempt to create contractual obligations on the part of the Suppliers beyond 1996 by claiming that such an obligation can be enforced by this Court under the doctrine of promissory estoppel. The Distributors seek to recover on a claim that is essentially a request for a court to equitably create contractual obligations where some of the formal requisites of a contract are absent.[7] The Distributors allege that AHSI made two "promises" that are enforceable here: (a) that it intended "to have a long-lasting

---

**7.** The Florida Supreme Court set forth the elements and parameters of a promissory estoppel claim in *W.R. Grace & Co. v. Geodata Serv., Inc.*, 547 So.2d 919 (Fla.1989). In a thorough discussion, the Court concluded that claims based on the doctrine of promissory

estoppel must (a) be based on promises that are definite and substantial in nature; (b) show a justifiable reliance on the promises made; and © show detrimental reliance on such promises. *Id.* at 924–25.

partnership," and (b) "that the Distributors would continue to have the exclusive right to sell certain products to the customers in their territories under the Hospital Contracts and otherwise." Complaint ¶ 9.2. The Distributors allegedly relied on these "representations," by (a) agreeing "to represent AHSI products, foregoing other opportunities," and (b) expending "significant amounts of their own money, resources, time and effort, including capital expenditures for AHSI equipment placed in hospitals and capital contributions for equipment under the 'On Loan' program." *Id.* Both of the alleged promises that form the basis for this claim concern AHSI's purported intention to have a binding contractual relationship with the Distributors that extended beyond the maximum two-year term provided by the Agreement.

The Florida Supreme court rejected a similar argument in *W.R. Grace & Co. v. Geodata Serv., Inc.,* 547 So.2d 919, 920 (Fla.1989), which held that the doctrine of promissory estoppel is only available "where the promise is definite, of a substantial nature, and [is] established by clear and convincing evidence." The facts in *W.R. Grace* are similar to the facts as alleged by the Plaintiffs here: a plaintiff contractor claimed that after the execution of a written contract for mining work, the defendant's employees advised the plaintiff that they would provide the plaintiff additional work beyond the time frame set in the contact if the plaintiff would purchase

additional equipment. *Id.* at 921.[8] Finding the alleged promises of the defendant to be without sufficient specificity, the Florida Supreme Court noted that the alleged representations were made "without any regard whatever to the termination provision of the contract or the contractual requirement that any modifications, amendments or changes be in writing." *Id.* at 924–25.

■ Here, alleged statements by AHSI that it intended to have a "long lasting partnership" and that the Distributors could "continue" to supply the hospitals under the price protection agreements are also alleged "without any regard...to the termination provision of the contract," and are, as a matter of law, far too indefinite to contradict the unambiguous language in the Agreement. It is impossible for this Court to give a specific meaning to a concept as vague as a "long lasting" partnership. It is equally unclear under exactly what terms "the Distributors would continue to have the right to sell certain products ... under the hospital contracts and otherwise." *See Hygema v. Markley,* 137 Fla. 1, 187 So. 373, 380 (Fla. 1939) (rejecting promissory estoppel claim because the promise "was not definite but, on the contrary, was entirely indefinite as to terms and time."); *Camina Serv. Inc. v. Shell Oil Co.,* 816 F.Supp. 1533, 1540 (S.D.Fla.1992) (citing *W.R. Grace,* the court held that "application of promissory estoppel may be rejected if the terms of the promise are indefinite.").[9]

---

**8.** It should be noted that here, at least some of the alleged promises were made before the Agreements were executed, and fail because of the merger doctrine and parol evidence rule.

**9.** Plaintiffs claim that AHSI "intended a long-term relationship," which allegedly means

that "if [the Distributors] performed up to expectations, they would continue to represent AHSI." As the Suppliers argue, this alleged promise is either consistent with the language of the Agreement, or it is so meaningless as to be unenforceable. The Agreement provides that distributors who do not breach the Agreement during the first term,

The alleged promises would be meaningful in this only case if they extend the term or length of the Agreements beyond December 31, 1996. To allow the Distributors to rely on the doctrine of promissory estoppel for this purpose despite the written Agreement that clearly and unambiguously expires on December 31, 1996, would, as in *W.R. Grace*, "wreak havoc with basic contract law." *W.R. Grace*, 547 So.2d at 925. Indeed, the very existence of the parties' Agreement—which specifically addresses the issue of the duration of the relationship—militates against the finding of promissory estoppel. As recognized in *W.R. Grace*, "mere expectations based on oral representations regarding future rights of parties to a contract, specific in its written terms, has been held insufficient to support a cause of action" for promissory estoppel. *Id.; See also Lozano v. Marriott Corp.*, 844 F.Supp. 740, 743 (M.D.Fla.1994).

■ Moreover, to sustain a claim for promissory estoppel, the Distributors' alleged reliance on the Suppliers' alleged promises of a "lasting partnership" and the continuing supply of products must be justified. As a matter of law, the Distributors simply cannot claim that they justifiably relied on statements of a "lasting partnership" and the continuing supply of products when it is completely inconsistent and irreconcilable with the express terms of the parties' written Agreement. The preceding discussion relating to Plaintiffs'

fraud claims applies equally here—"reliance" on promises specifically contradictory to a written agreement is unjustified as a matter of law. *See Barnes*, 932 F.Supp. at 1441 (reliance unreasonable and unjustifiable in light of contradictory terms of franchise contract). Indeed, even absent a controlling, written contract, Plaintiff's reliance would be unreasonable because the alleged promise to extend the parties' business relationship indefinitely is just that, indefinite. As noted above, the Florida Supreme Court is loathe to find justified reliance on a promise lacking a "definite and substantial character in relation to the remedy sought." *W.R. Grace*, 547 So.2d at 924.

■ In addition, to properly state a claim for promissory estoppel under Florida law "requires more than mere reliance. It requires reliance that causes a detrimental change of position." *Pinnacle Port Community Ass'n, Inc. v. Orenstein*, 872 F.2d 1536, 1543 (11th Cir.1989). Searching for detriment to the plaintiff, the *Pinnacle Port* Court asked "whether [the plaintiff] took action other than what it would have done had it not believed [the defendant] was obligated under the [alleged promise]." *Id.* The Distributors assert that, in reliance on the Suppliers' alleged representations, they "agreed to represent AHSI products, foregoing other opportunities, and then expended significant amounts of their own money resources, time and effort, ...." Complaint,

---

e.g., by meeting all quotas and performing "up to expectations," would be renewed for an additional one-year term, while those who did not meet their quotas might not be.

Further, it is undisputed that "quotas" were set by the parties' Agreement. Without that document and its provisions relating to the establishment of quotas, any "promise" that the Distributors "could keep the line as long

as they met quotas" is entirely meaningless. A promise that makes no sense in the absence of a written contract logically must lack the definiteness required by the Florida Supreme Court, as it cannot be independently enforced. Similarly, the word "expectations" only gains specificity of meaning by relation to the quotas described in the Agreement.

¶ 9.2. Such action is identical to the Distributors' contractual obligations to exclusively represent and sell AHSI's products, as identically alleged in the Complaint, and thus does not constitute the detrimental change of position necessary to support this claim. *Id.* at ¶¶ 3.4, 3.5.[10]

Finally, the Distributors seek to enforce an oral promise that would extend the parties' rights and obligations for more than one year, and thus their claim is barred under Florida's Statute of Frauds. Under well-settled Florida law, the Statute of Frauds bars the enforcement of an oral contract when the parties intended and contemplated that performance of the agreement would take longer than one year. Fla. Stat. § 725.01 (1993); *Yates v. Ball*, 132 Fla. 132, 181 So. 341, 344 (1937). It is not disputed by the Plaintiffs that the Suppliers' promises—upon which they allegedly relied and upon which they base their claim for promissory estoppel—would result in a binding relationship to have lasted more than one year. In Florida, it is a clearly established rule of law that the Distributors cannot avail themselves of the doctrine of promissory estoppel as a means to circumvent or defeat the Statute of Frauds; if the statute of frauds renders an oral agreement unenforceable, a plaintiff cannot maintain an action for breach of the agreement under a theory of promissory estoppel. *Tanenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So.2d 777, 779 (Fla. 1966). In *Tanenbaum*, the Florida Supreme Court explicitly refused to "adopt by judicial action the doctrine of promisso-

ry estoppel as a sort of counteraction to the legislatively created Statute of Frauds." *Id.*

The *W.R. Grace* Court recognized the "havoc" that would be wrought if a party (and the judiciary) could eviscerate statutory requirements based on oral statements—all under the doctrine of promissory estoppel:

> The law of written contracts, including the statute of frauds, would be substantially changed if we approved the application of promissory estoppel under the facts of this case. It would also become extremely difficult for parties to fully understand or be advised of their rights and obligations under written contracts.

*W. R. Grace*, 547 So.2d at 925; *see also Coral Way Properties, Ltd. v. Roses*, 565 So.2d 372, 373 (Fla. 3rd DCA 1990) (holding that the statutory requirement that certain contracts be in writing cannot be circumvented by re-labeling a claim for enforcement of an oral contract as a claim for "promissory estoppel.") The Distributors cannot recast a claim for breach of oral promises for a "lasting partnership" or continued supply of products as claims of "promissory estoppel" in order to circumvent the statute of frauds. Their effort to extend the two-year duration of the parties' Agreement by alleged oral promises runs afoul of the statute, and are therefore barred.[11]

**D. The Distributors' Claim for Tortious Interference**

The Distributors allege that following the Merger, the Suppliers began to tor-

---

**10.** The Distribution Agreements also required significant effort on the part of the Distributors for the sale and promotion of these products. *See e.g.,* Agreement at ¶ 6(a) Promotion of Sales, ¶ 6(d) Trade Shows and Medical Conventions, and ¶ 7 Training.

**11.** This Court also rejects Plaintiffs' claim that their part performance of the alleged prom-

ises excuses them from the rigors of the Statute of Frauds. It should be noted that the dissenting opinion in *Tanenbaum* advanced this same argument, which was rejected by the majority. Moreover, as discussed above, the "performance exception" to the Statute of Frauds applies only when a plaintiff seeks purely equitable relief. Because Plaintiffs here seek to obtain a remedy at law rather

tiously interfere with the Distributors' relationships with their hospital customers.[12] The Suppliers allegedly interfered with these relationships in two ways: 1) by selling or attempting to sell Products directly to the Distributors' customers notwithstanding the Distributors' price protection agreements with these customers and 2) by taking steps to delay the supply of Products to the Distributors, including "placing orders on 'credit hold,' shipping products by slow transportation, and issuing new catalog numbers," and after 1996 by refusing to sell any Product to the Distributors.[13] Neither of these types of alleged interference can survive summary judgment.

### 1. Interference By Direct Sales in Distributors' Exclusive Territories

■ Plaintiffs' claim that the Suppliers' direct sales to customers within the Distributors' exclusive territories constitutes tortious interference is defective for two reasons. First, these allegations simply restate the Plaintiffs' claim for breach of the Agreement, and as such this claim is barred under Florida's economic loss rule. Plaintiffs alleged in both their claim for

tortious interference and their claim for breach of contract that the very conduct that constitutes the interference: (a) both breached the existing agreements and interferes with the Distributors' customer contracts and relationships, Complaint ¶ 3.22; (b) is in "violation of the Distribution Agreements." *Id.* ¶ 3.23; and (c) "violates exclusivity provisions in the Distributions Agreements." *Id.* ¶ 3.24. The damages claimed by Plaintiffs here are identical to those claimed under the breach of contract theory, and the facts necessary to prove this type of interference are identical to those needed to prove any breach of contract.

While Plaintiffs cite to the case of *Future Tech Int'l., Inc. v. Tae Il Media, Ltd.,* 944 F.Supp. 1538 (S.D.Fla.1996) in support of their argument that the economic loss rule does not apply, that case is distinguishable on several points. As an initial matter, *Future Tech* involved a motion to dismiss; there was no factual or evidentiary record and the court was bound to accept the plaintiffs' allegations as true. Second, *Future Tech* was decided before the Florida Supreme Court issued it opinion in *HTP, Ltd. v. Lineas Aereas Costar-*

---

than equity, their claims are indeed barred by the Statute of Frauds.

**12.** In Florida, "To establish liability under the tort of interference with a business relationship, a plaintiff must prove: (1) that a business relationship existed under which the plaintiff had legal rights; (2) that the interferer knew of the relationship; (3) that the interferer intentionally and unjustifiably interfered with the relationship; and (4) that damages resulted from the breach." *Schubot,* 757 F.Supp. at 1359.

**13.** The Plaintiffs have alleged that the Suppliers were their partners with regard to the On Loan Program and that the price protection agreements reflected the parties' alleged modification of the Agreement. As the Suppliers

argue, if these allegations were accepted by this Court, Florida law would recognize no claim for interference with these same hospital contracts on the part of the Suppliers. *See Genet Co. v. Annheuser–Busch, Inc.,* 498 So.2d 683, 684 (Fla. 3d DCA 1986) (citing *Ethyl Corp. v. Balter,* 386 So.2d 1220 (Fla. 3d DCA 1980), *rev. denied,* 392 So.2d 1371 (Fla.1981), *cert. denied,* 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981)) (holding that claims for tortious interference are not permitted against parties who are themselves participants in the business relationship allegedly interfered with). Because this Court has rejected the Plaintiffs' claims that a partnership existed or that the hospital contracts reflected a modification of the Agreement, Defendants' arguments relating to these issues, while correct, are moot.

*ricenses,* 685 So.2d 1238, 1239 (Fla.1996). *HTP* made clear that Florida courts should compare the facts necessary to prove the tort and contract claims, and if such facts are "interwoven," the economic loss rule applies. Finally, in *Future Tech* the court refused to apply the rule where "in the broadest sense [the tortious interference] allegation can be seen as an offshoot of the breach of exclusivity arrangement in Count I of the complaint," while "the focus here is on the Defendants' behavior with third parties, rather than the contractual relationship" between the parties. *Future Tech,* 944 F.Supp. at 1568.

Here the damages sought as a result of Davol's alleged efforts to sell its own products to the Distributors' customers are not connected to the particular instances of interference the Plaintiffs have been able to identify. Rather, the Plaintiffs seek lost profits from all current and future accounts through 2004 to compensate them for the limited number of alleged acts of interference. Second, the facts of this matter reveal that the Plaintiffs are not alleging conduct which might "in the broadest sense" be seen as an "offshoot" of their contract claims. Rather, the actual conduct of which the Plaintiffs complain, i.e., Davol trying to sell its products directly to the Distributors' customers, would be, if true, a material breach of one of the core provisions of the Agreement, whether or not the Distributors have separate hospital contracts with the customers. The proof of the conduct constituting the Suppliers' breach of contract is accomplished by the same facts as the proof of the conduct constituting the tortious interference. The damages are purely economic, and are in fact the same as those sought in the breach of contract count. *HTP* instructs that this is an issue of contract law, not of tort law; the facts necessary to prove that Davol interfered with the Plaintiffs' hospital relationships are identical to the facts necessary to prove that Davol violated the exclusivity provisions of the Distribution Agreements. They are not just intertwined—they are identical.

As the Suppliers point out, Davol acquired AHSI in October 1995 and until that time sales representatives for Davol were in the Distributor's exclusive territory competing with the Plaintiffs by doing virtually everything that the Complaint alleges to be tortious interference herein. For example, Plaintiffs do not dispute that until October 1995, Davol made "numerous direct sales contacts" in the Distributors' exclusive territory and told the Distributors' customers that they should deal directly with Davol and not with the Distributors. Nor do they dispute that, until October 1995, Davol offered greater discounts to these potential customers, and tried to "convert" or "take away" the existing business between the Distributors and hospital customers. There further appears to be no dispute that before October 1995, and after the Agreement was signed in late 1994, Davol's sales representatives were directly competing with the Distributors.

It also appears to be undisputed that beginning on January 1, 1997, Davol resumed its direct contact with customers in the Distributors' exclusive territory, again conducting itself in very much the same manner that the Plaintiffs maintain constitute tortious interference. Yet Plaintiffs do not attempt to hold the Suppliers liable for such "tortious" conduct, either when it occurred before October 1995 or when it resumed on January 1, 1997. Rather, the Distributors claim that all of the tortious interference occurred between October 1995 and December 31, 1996 when alleged-

ly Davol was acting in the very same manner both before and after that time period.[14]

What makes Davol vulnerable to the Distributors' claims between October 1995 and December 31, 1996 is one fact and one fact only: Davol through the acquisition of AHSI became contractually obligated to stop competing with the Distributors in their exclusive territory. Thus, Davol—now that it had assumed the contractual obligations of the Agreement—could not enter into the Distributors' exclusive territories to "contact numerous customers" and persuade them to "deal directly with Davol" and bypass the Distributors. In other words, between October 1995 and December 31, 1996 Davol's actions purportedly breached the very terms of the Agreement. But outside that time period, no such claim lies because no such contractual ban existed. Hence the very same facts necessary to show a breach of contract are necessary to show tortious interference. Under the Florida's economic loss rule, this tort action is barred.

Davol's alleged tortious conduct, i.e., converting accounts to its own use and encouraging hospitals to buy directly from them, was also prohibited by the Agreement. With no Davol products to sell before October 1995 and after December 31, 1996, the Distributors were not subject to interference in this fashion. It was only Davol's alleged efforts to sell its own products to the Distributors' hospital customers that created the interference claim. The only reason Davol was allegedly not allowed to attempt to sell its own products

to these hospitals was that the Distributors had the exclusive right to do so under the Agreement Davol inherited from AHSI. Therefore, the factual inquiry needed to prove such allegations will be the same whether it is to prove Plaintiffs' alleged breach of contract in Count Three of the Complaint or to prove the tortious interference in Count Seven. The facts surrounding the interference claim are certainly "interwoven" with the facts surrounding the breach of contract; because of the absence of an independent tort, the economic loss rule bars this claim.

■ Plaintiffs' interference claims based on direct selling also fail for a second reason: the Distributors have made no effort to demonstrate that any of the specifically identified acts of interference resulted in any particular damages. Rather, they seek the same damages as they seek from almost all of their claims, i.e., years worth of future profits for lost sales to all of their actual and prospective customers from January 1, 1997 forward. They have presented no proof that the specific acts of alleged interference caused any particular damages. For example, while the Distributors may claim that Davol attempted to convert a particular hospital into a direct sales account, they have offered no evidence to provide that such an effort was successful, i.e. that any business was lost by the Distributors as a result of such an attempt. As the Eleventh Circuit clarified in *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1091 (11th Cir. 1994), "[a]n integral element of a claim of tortious interference with a business rela-

---

**14.** Plaintiffs do not claim that Davol interfered with their business or contractual relationships before October 1995 or after December 31, 1996. Their Complaint alleges that it was Davol and Bard that interfered with the Distributors after the merger. Complaint ¶ 3.21. Both Plaintiffs also acknowledge that they do not claim any act of interference occurred after December 31, 1996 when the Court declared the Agreements to have lapsed.

tionship requires proof of damage to the plaintiff as a result of the breach of the relationship." Proof of nominal damages will not suffice. *Id.* As with the claim for breach of contract, there are no damages flowing from this alleged tort beyond the end of 1996.[15] And because the Plaintiffs have adduced no evidence that they suffered any damages during 1995 or 1996 as a result of the alleged interference, this claim cannot survive a summary judgment.

### 2. Interference by Delay in Selling or Refusal to Sell Products

Plaintiffs also allege, as part of their interference claim, that Davol "plac[ed] orders on 'credit hold,' shipp[ed] products by slow transportation, and issu[ed] new catalog numbers" and that these activities constituted interference. These "delay" claims, like the claims involving the taking or converting of hospital customers, are also barred by the economic loss rule. The only reason Davol would have any obligations regarding a "credit hold" policy, shipment of products by a certain type of transport, and the like would be if the parties' contractual relationship were to create such obligations. These are not the type of duties that members of society generally owe to one another, i.e., the types of duties generally enforceable under tort law. While the alleged conduct might amount to breaches of the parties' Agreement, the economic loss rule bars Plaintiffs from re-labeling such breaches as tortious conduct. *See Roberts Co., Inc.*, 322 So.2d at 634 ("[defendant] allegedly

having breached its contract with the plaintiff, this breach of contract may not be converted into a tort by allegation of wrongful interference with a favorable financial relationship"); *See also Crain v. Sunbank/Gulf Coast, Inc.*, 1996 WL 172984 (M.D.Fla. April 11, 1996) (holding that claim of tortious interference is barred by economic loss rule).

Plaintiffs also claim that Davol's failure to sell them products in 1997 and beyond constituted "total interference at *all* accounts." Response at 44, n. 188. Emphasis in original. But it cannot be said that the Suppliers' failure to honor an alleged contractual obligation to supply the Plaintiffs with Products is interference with any opportunity the Distributors may have had to resell those same Products. Under the Plaintiffs' logic, even if Davol had no sales representatives, as long as it had a contract to supply Eclipse or Horizon with goods and then failed to do so, it would be interfering with the Distributors' relationships with every one of their customers or potential customers. Indeed, taking the Distributors' logic to its natural conclusion, any breach of the parties' Agreement by the Suppliers that in any way interfered with the Distributors providing Davol/AHSI products to customers—which most breaches could be characterized as doing—would constitute tortious interference. This alleged interference has nothing to do with conduct toward third parties—its "focus" is on the parties' contractual relationship. It is exactly this sort of legal alchemy, i.e., the

---

**15.** The Distributors claim damages resulting from Davol's interference with their efforts to sell Davol Products only, i.e., Plaintiffs do not claim that Davol interfered with their sales of other suppliers' products to their customers. As such, because this Court has held that the Distributors' entitlement to buy Davol prod-

ucts ended on December 31, 1996, the Distributors could not possibly have suffered any damages as a result of the alleged interference after that date. Regardless of Davol's actions, the Plaintiffs had no Product to sell after 1996.

conversion of alleged breaches of contract into tort claims, that the economic loss rule was designed to prevent. Accordingly, to the extent that the "tortious interference" claim is based on delaying the delivery of or ultimately refusing to sell Products, this claim is barred by the economic loss rule.

### E. The Distributors' Statutory Claims

Plaintiffs have also asserted claims pursuant to two consumer protection statutes, the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and the Florida Sale of Business Opportunities Act ("FSBOA").

■ FDUTPA offers two types of remedies: equitable relief in the form or declaratory or injunctive relief pursuant to Fla. Stat. 501.211(1) or "actual damages" pursuant to Fla. Stat. 501.211(2). The Plaintiffs here seek damages in the form of lost future profits only, arguing that such lost profits are indeed the "actual damages" provided by the statute. However, "actual damages" under FDUTPA is a term of art, defined by Florida courts as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered ..." *Urling v. Helms Exterminators, Inc.*, 468 So.2d 451, 454 (Fla. 1st DCA 1985). Indeed, Florida courts specifically reject the recovery of consequential damages under FDUTPA. *Id; see also Rollins, Inc. v. Heller*, 454 So.2d 580, 584–585 (Fla. 3d DCA 1984). While Plaintiffs seek to label future lost profits as "actual damages," as the Eleventh Circuit has explained, "lost profits may indeed be the quintessential example of consequential damages." *See Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir.1987). Because

they do not seek either equitable relief or actual damages, Plaintiffs may not maintain a private claim under FDUTPA.

Plaintiffs' allegation that Defendants' acts constitute a violation of the Florida Sale of Business Opportunities Act ("FSBOA") is even more dubious than their FDUTPA allegations. Under FSBOA, entities which sell "business opportunities" are prohibited from engaging in certain practices. Under Florida Statutes § 559.801, "Business opportunity" is defined as "the sale or lease of any products, equipment, supplies or services which are sold or leased to a purchaser to enable the purchaser to start a business for which the purchaser is required to pay an initial fee or sum of money which exceeds $500 to the seller...." § 559.801, Fla. Stat. (1995). Thus, the statute only applies to relationships in which the purchaser or lessee purchased items or services in order to begin a previously non-existent business.

■ The Distributors claim that the On loan Program was a "business opportunity" that was sold to them by AHSI, and that this sale was accompanied by acts on the part of the Suppliers that violated the FSBOA. However, the Plaintiffs have not provided any evidence that any "initial fee" was ever paid to the Suppliers in exchange for the right to participate in the On Loan Program, a plain prerequisite of any recovery under FSBOA. Although the Plaintiffs allege that they had the option of contributing to the placement of equipment in certain hospitals, they do not allege—and there is no evidence—that they were obliged to pay anything for the opportunity to participate in the On Loan Program. Thus, no "new business opportunity" was ever sold to the Distributors, and the absence of the prerequisite $500 initial payment is fatal to the Plaintiffs'

FSBOA claim.[16]

### F. Claims Against Defendant C.R. Bard, Inc.

While the Distributors have named C.R. Bard in each of their counts, the Plaintiffs have not presented evidence of—or indeed even alleged—facts necessary to impute liability to the corporate parent of Davol and AHSI. The Distributors claim that Bard is liable for every count alleged in the Complaint under one or more of three separate theories: 1) successor liability, 2) shareholder or officer liability and 3) liability as a parent corporation. However, the Distributors have not proved—and in some cases not even alleged—facts necessary to hold Bard accountable for the wrongdoing alleged in the Complaint.

■ First, Bard is not liable for AHSI's pre-Merger acts under some theory of successor liability. In *Graef v. Hegedus,* 698 So.2d 655 (Fla. 2d DCA 1997), relied upon by the Plaintiffs, the court explained that "In Florida, the liabilities of a predecessor corporation are not imposed upon the successor company unless '1) the successor expressly or impliedly assumes the obligations of the predecessor, 2) the transaction is a *de facto* merger, 3) the

successor corporation is a mere continuation of the predecessor, or 4) the transaction is a fraudulent effort to avoid the liabilities of the predecessor.'" (Citations omitted). The Agreement and Plan of Merger make clear that the Merger was conducted by means of merging AHSI with a separate corporation, Bard Maryland, Inc., with AHSI thereafter remaining as the surviving corporation. There has been no evidence presented that Bard either expressly or impliedly assumed any of AHSI's liabilities, that AHSI was in some *de facto* sense merged into C.R. Bard, that Bard is a "mere continuation" of AHSI, or that the Merger itself was in any way fraudulent. While *Greaf* may impose liability upon the surviving company known as AHSI—or indeed upon Davol—it does not impose such liability upon Bard.

■ Plaintiffs next claim that Bard is liable as a shareholder or officer of AHSI and/or Davol. But as Plaintiffs' own cases hold, an officer or shareholder will not be held accountable for the acts of the corporation without evidence of their direct participation in the tortious conduct and independent actionable conduct. *See, e.g., In re Gitelman,* 74 B.R. 492 (Bkrtcy.S.D.Fla. 1987), *In re Firestone,* 26 B.R. 706 (Bkrtcy.S.D.Fla.1982). Here Plaintiffs al-

16. The Defendants also argue that the On Loan Program by its nature is not the type of business opportunity that the FSBOA was intended to address. They cite *Batlemento v. Dove Fountain, Inc.,* 593 So.2d 234 (Fla. 5th DCA 1991), *rev. denied,* 601 So.2d 551 (Fla. 1992), which relied on the legislative history of the FSBOA to determine what types of transactions constitute sales of business opportunities under the Act. That legislative history provides that "by example, business opportunities include worm farms, chinchilla ranches, bubble gum vending machines, vitamin sales and numerous other programs that offer the buyer the opportunity to own and operate his own business, often inserting the phrase 'in your spare time.'" *Id.* at 239 n. 8

(citing Senate Bill 1205, Commerce Committee, Legislative History); *see, e.g., Grover v. State,* 581 So.2d 1379 (Fla. 4th DCA 1991) (holding that business opportunity involved leasing and selling of Pepsi–Cola and Coca–Cola vending machines, together with service and maintenance); *Adams v. State,* 443 So.2d 1003 (Fla. 2d DCA 1983) (holding that business opportunity involved sale of rabbit breeding kits and pelt marketing memberships). Because no business opportunity was ever sold by the Defendants and no initial fee was ever paid by the Plaintiffs, this Court need not determine whether the On Loan Program falls within the scope of FSBOA.

lege that Bard's liability stems from 1) approving the acquisition of AHSI with the intention of terminating the Distributors, 2) unilaterally demanding a change in the Distributors' stocking status, 3) issuing notices of termination of the distributors, 4) telling Davol's president that AHSI intended the relationship to require only one renewal term, and 5) condoning "Davol's roguish behavior." Response at 49. Not one of these allegations can form the basis for holding Bard liable to the Distributors for breach of contract, fraudulent inducement, tortious interference, or any of the other counts brought against Bard.[17]

Finally, Plaintiffs attempt to hold Bard liable for the alleged acts of AHSI and Davol under a theory of parent company liability. As the Court held in *Federated Title Insurers, Inc. v. Ward,* 538 So.2d 890, 891 (Fla. 4th DCA 1989), "a parent corporation will not be held liable for the actions of its subsidiary unless the subsidiary is deemed to be a mere instrumentality of the parent." The Plaintiffs here have not so much as alleged that either AHSI or Davol is a "mere instrumentality" of Bard, and indeed "a mere instrumentality

finding is rare." *Id.* Accordingly, as a matter of law, Bard cannot be held liable for the conduct of its subsidiary corporations based on the allegations before this Court. As Plaintiffs have not satisfied their burden of demonstrating some basis for C.R. Bard to be liable under any of their theories, summary judgment on all counts is appropriate as to that entity.

### G. Plaintiffs' Breach of Contract Claims

After all is said and done, this is a contract case. This Court has determined that the contract that is the subject of this case is, as a matter of law, clear and unambiguous as to the provisions at issue here: the Suppliers simply cannot be liable for breach of contract after the end of 1996. As discussed above and throughout this order, alleged promises made before the Agreements were signed are merged in to the Agreements, and no effective post-Agreement "modifications" have been proffered by the Plaintiffs.[18]

### 1. Alleged Prior Agreements

To the extent that Plaintiffs allege the existence of oral agreements that were made prior to the execution of the Agree-

---

17. As to allegedly possessing some "intent" to terminate the distributors, and indeed issuing notices to this effect, it is undisputed that the relationships were not terminated prior to the end of 1996. Nor is "unilaterally" demanding that Plaintiffs change their stocking status actionable. Aside from the absurdity of accusing Bard of taking too strong a bargaining position in its negotiations with the Plaintiffs, it is undisputed that the Distributors objected to these "demands" and never changed the stocking nature of their Distribution Agreements. Response at 20. Nor can Bard's allegedly telling Davol that AHSI intended only one renewal term—as expressly provided in the Distribution Agreements—provide the basis for liability to the Distributors. And "condoning" unspecified "roguish" behavior is an impossibly tenuous basis for imposing tort liability against an independent entity. In

sum, the Distributors have not identified anything Bard did that could form the basis for liability.

18. As an initial matter, the Plaintiffs do not clearly answer the question of what contract they are seeking to enforce. Plaintiffs suggest that there is both a prior/contemporaneous oral agreement and an oral/by-conduct modification to the Agreement, but do not specify what the terms of these other contracts are. However, because this Court does not recognize any prior agreements regarding the duration of the parties' relationship or any modification of the Agreement that extends its term, Plaintiffs' lack of clarity is no impediment to summary judgment.

ment, such agreements are deemed merged into the parties' contract. The Agreement contains a merger clause, clear and unambiguous on its face, which provides that "this Agreement reflects the entire agreement between the parties and cancels all prior agreements and commitments, verbal or written, between the parties." The parties' contract language mirrors the common law of this jurisdiction, which is equally clear with respect to the merger of prior or contemporaneous representations. "Under Florida law, evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Chase Manhattan Bank v. E.B. Rood*, 698 F.2d 435, 436 (11th Cir. 1983). This basic principal was affirmed in *Schubot* where this District again explained that "in Florida, it is well settled that representations which are made before or during the signing of a contract . . . 'are presumed to have merged into the written agreement.'" 757 F.Supp. at 1358. "Verbal statements between the contracting parties prior or during the execution of a contract merge into the subsequent written contract."[19] *Id.*

By this Court's December 31, 1996 Order, the Agreement was clear and unambiguous in creating a single term (until the end of 1995) and, if no termination had occurred, a single renewal term (until the end of 1996). Thus, any prior or contemporaneous representations regarding the duration of the Agreement are merged into the Agreement as a matter of law, and any evidence supporting such representations is inadmissible to prove that the parties' Agreement extended beyond 1996. To the extent that the Distributors make this claim, the parties entered into an Agreement that by its own specific terms and by force of law cancels all prior promises, understandings, contracts, agreements, commitments, verbal or written, that the Plaintiffs can allege to have become part of the Agreement.[20]

## 2. Alleged Contract Modifications

 Plaintiffs have also alleged that the parties modified their Agreement to

**19.** *See also Carlon, Inc. v. Southland Diversified Co.*, 381 So.2d 291, 293 (Fla. 4th DCA 1980) ("It is established in Florida that presentations, negotiations and conversations which precede an accompanying the making of a contract are presumed to have merged in the contract."); *Bleemer v. Keenan Motors, Inc.*, 367 So.2d 1036, 1038 (Fla. 3d DCA 1979) ("Ordinarily, representations and negotiations which precede and accompanied the making of contracts are presumed to have merged into the written contract.").

**20.** Plaintiffs claim that they are entitled to present parol evidence of an oral agreement entered into contemporaneously with the Distribution Agreements under the Florida Supreme Court decision *Mallard v. Ewing*, 121 Fla. 654, 164 So. 674 (Fla.1935). That case discussed an "inducement exception" to the customary rule that if a written contract in unambiguous terms expresses the intent of the parties, parol evidence shall not be admitted to limit or contradict that intent. The

Eleventh Circuit, while reversing a district court's decision to admit parol evidence in a case similar to the case at bar, held that many Florida courts do not even recognize the *existence* of such an exception if the written contract is unambiguous. *Chase Manhattan Bank v. E.B. Rood*, 698 F.2d 435, 438 n. 3 (11th Cir.1983)(citing *Anderson v. Trade Winds Enters. Corp.*, 241 So.2d 174, 177 (Fla. 4th DCA 1970), *cert. denied*, 244 So.2d 432 (Fla.1971)); *see also Bryant v. Food Mach. and Chem. Corp. Niagara Chem. Div.*, 130 So.2d 132 (Fla. 3d DCA 1961); *Mullins v. Sunshine State Serv. Corp.*, 540 So.2d 222 (Fla. 5th DCA 1989).

Further, the "inducement exception" to the parol evidence rule can not apply if the oral agreement contradicts the written agreement. As one Florida Appellate Court has explained, "testimony as to a contemporaneous oral agreement was not admissible. It did not fit under the exception for oral agreements which induce execution of the written agreement, because the alleged oral agreement re-

create an obligation for the Suppliers to provide Product to the Distributors beyond 1996. It should first be noted that the Agreement contains an explicit requirement that any attempt to modify the document must have the same formality that accompanied the execution of the Agreement itself. Plaintiffs correctly point out that contracts containing such language may nonetheless be modified. However, modification by oral agreement or conduct must be based on "clear and unequivocal evidence of a mutual agreement" to amend the written contract, such that failure to enforce the amendment would work fraud on either party to refuse to enforce it. *FDIC v. Tom Murphy Construction Co.*, 674 F.2d 880, 885 (11th Cir. 1982). Plaintiffs have not met this burden.

To the extent that the Distributors suggest that a contact modification created a "perpetual performance" relationship, such allegations must fail. Because a modification of the parties' Agreement must satisfy the same "meeting of the minds" test as the original contract, no post-Agreement modification created the alleged "perpetual performance" contract. *See Binninger v. Hutchinson*, 355 So.2d 863, 865 (Fla. 1st DCA 1978) ("It is 'hornbook law' requiring no citations to authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified; subsequent modifications require consent and 'a meeting of the minds....'") (*quoting Tropicana Pools, Inc. v. Boysen*, 296 So.2d 104, 108 (Fla. 1st DCA 1974)). It is undisputed that the

Distributors believed—before they signed the Agreement, at the time of the signing, and after the signing—that the Agreement granted them the automatic annual renewal. As a result, clearly there can be no "meeting of the minds" between AHSI and the Distributors regarding any amendment that would create a perpetually renewing contract when the Distributors believed that the Agreement always provided such a term. As such, to the extent that the Plaintiffs are claiming that the parties' Agreement was perpetually renewing because of some modification of the Agreement, such a claim must be logically rejected as a matter of law.

■ Next this Court addresses the Plaintiffs' allegations that the On Loan Program reflected a modification of the Agreement to create a post–1996 obligation to supply Product on the part of the Defendants. Plaintiffs claim that the On Loan Memorandum—a document not signed by them—represented a written amendment to the parties' Distribution Agreements. Not only does this document not bear any indicia of being such an amendment, but it does not even address the question of how long the parties' relationship was to last, and on what terms. Whether the parties participated in the various versions of On Loan Programs is not subject to factual dispute. What Plaintiffs cannot show is that these programs—whether or not they eventually came to modify the Agreement—created a specific and enforceable obligation by AHSI to continue selling products to the

lated to the identical subject matter embodied in the written agreement and, in fact, directly contradicted an express provision of the written agreement." *Linear Corp. v. Standard Hardware Co.*, 423 So.2d 966, 968 (Fla. 1st DCA 1982),*citing E.J. Sparks Enterprises v. Christman*, 95 Fla. 928, 117 So. 388 (1928)

and *Johnson v. Johnson*, 403 So.2d 1388 (Fla. 2d DCA 1981), *rev. denied*, 544 So.2d 200 (Fla.1989). The Agreements are unambiguous with regard to their term, and evidence of alleged contemporaneous oral agreements to the contrary are simply not admissible.

Distributors after December 31, 1996. Nor can Plaintiffs explain how On Loan Programs, including hospital price protection agreements, that began before the Agreements were executed could serve as a modification of clear and unambiguous terms of those contracts. Thus, not only do the documents relied upon by the Distributors lack the requisite formality of a contract modification, they do not even purport in any way to modify anything.

Plaintiffs allege that the price protection agreements signed between themselves and the hospitals were evidence of an amendment of the Agreement that extended the term to at least as long as the individual contracts themselves. There is no support for such a proposition either legally or factually, however, and indeed this claim is inconsistent with the Distributors' other theories of this case. To begin with, the Distributors have repeatedly alleged that the price protection agreements are separate and distinct agreements between themselves and their hospital customers. Clearly the price protection agreements themselves do not modify the parties' Agreement. Indeed, not one of the various versions of the hospital agreements provided by the Plaintiffs says that it is a modification of the parties' Agreement.

Moreover, as discussed herein, Florida's Statute of Frauds requires contracts to be in writing if they are not to be performed within one year, and bars the Distributors' claim of an oral agreement to supply Products for more than two years. The Distributors claim that the Defendants breached "agreements and commitments to a long-lasting partnership," by which they apparently mean one longer than the two years provided by the Agreement. Such an "agreement," to the extent that it is based on oral representations by AHSI personnel, would clearly constitute an oral "agreement that is not to be performed within the space of one year from the making thereof." § 725.01, Fla. Stat. (1993). For these same reasons, the Statute of Frauds also bars any claim by the Plaintiffs that they orally modified the Agreement to extend its duration. "There can be no oral modification of an agreement which was required to be in writing by the statute of frauds." *United Omaha Life Ins. Co. v. Nob Hill Assoc.*, 450 So.2d 536, 539 (Fla. 3d DCA 1984). Again, to the extent that the parties' original agreement to a relationship beyond one year was required to be in writing, any modification to this effect must also satisfy the Statute of Frauds.

Plaintiffs apparently do not dispute that the oral contract they seek comes within the purview of the Statute of Frauds. Rather, they claim that there are sufficient documents to memorialize the agreement—citing to, basically, every On Loan Program document. Notwithstanding the quantity of documents relating to the On Loan Program, the Court can identify no document that purports to be a contract modification or that actually says that Davol must sell product to the Distributors after 1996. The On Loan Memorandum does not say so, the deal sheets do not say so, the hospital price protection agreements do not say so, and no correspondence says so. The Distributors cannot base a contract modification on the mere existence of the On Loan documents. The Statute of Frauds makes clear that Plaintiffs' alleged oral modification is not enforceable "unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith."

§ 725.01, Fla. Stat. (1993). No such document exists. To the extent that the Plaintiffs have pled that the parties are bound by oral agreements to extend their contract indefinitely, such claims are barred and summary judgment is hereby entered on behalf of the Suppliers as to these claims.[21]

In sum, Plaintiffs can prove no enforceable modification of the Agreement that extended the term of the Agreement beyond the end of 1996. Only one breach of contract claim can legally survive, namely, an allegation that the Suppliers violated some term of the Agreement during the pendency of the Agreement. As to all other alleged breaches of contract, summary judgment is hereby granted in favor of the Suppliers. Thus, to the extent that a breach of the Agreement before January 1, 1997 resulted in damages, Plaintiffs may assert such a claim.[22]

### H. The Suppliers' Counterclaims

The evidence regarding Eclipse and Horizon's failure to pay for Products they purchased is not controverted by the Plaintiffs. It is undisputed that the Distributors failed to pay the Suppliers for products purchased, and that the Agreement obligated them to do so. The Suppliers claim that the total amount owed by Eclipse for its purchases of Products is $99,017, and the total amount owed by Horizon for its purchases is $75,427. The

Plaintiffs do not dispute that they bought Product without paying, and do not dispute the amounts claimed to be owed. The only defense to summary judgment on these claims raised by the Plaintiffs is the litany of allegations of misconduct by the Suppliers that form the basis for the Plaintiffs' affirmative claims in this case.

In view of this Court's rulings above, plaintiff's claims do not constitute a defense to the Suppliers' claim that products were purchased but not paid for. *See Prudential Bache Securities, Inc. v. Pitman*, 1991 WL 160039 *3 (N.D. Ga. April 4, 1991) (rejecting defendants' claim that torts allegedly committed by plaintiff as alleged in counterclaims defeat summary judgment on plaintiffs' affirmative claims.) Nor does a claim for "set-off" defeat summary judgment on claims ripe for adjudication. *See Edelen & Boyer Co. v. Kawasaki Loaders, Inc.*, 1993 WL 4177, *2 (E.D.Pa. January 5, 1993) (granting summary judgment on defendants' counterclaim where plaintiffs' claims of money owed were already raised in the complaint.)

Merely reiterating the affirmative claims they have made in their own Complaint cannot save the Plaintiffs from a proper summary judgment on the Suppliers' claims. There remain no material issues of fact to try regarding the Suppliers' counterclaims, and as such the motion for summary judgment is hereby granted as to those claims in the amount of $99,017 as to Eclipse and $75,247 as to Horizon.

---

**21.** As discussed above, the Suppliers have not breached "agreements and commitments to a long-lasting partnership" because there is no contractual partnership between the parties. Plaintiffs cannot point to a single document that purports to be an expression of the parties' joint intent to reverse the explicit terms of the Agreement and create such a relationship, and have failed to prove the legal prerequisites to the existence of such a contract.

As such, any claim that the Suppliers violated a "partnership" contract is rejected.

**22.** To the extent that the Distributors continue to allege that the Suppliers violated some implied covenant of good faith within the Agreement, their proof is similarly bound to alleged breaches of such a covenant during the pendency of the Agreement.

## V. CONCLUSION

Having considered the motion and the pertinent parts of the record, and being otherwise fully advised in the premises, it is

ORDERED and ADJUDGED that Defendants' Motion for Summary Judgment [DE–154] be and the same is hereby GRANTED. Summary judgment is hereby entered in favor of Defendants AHSI, Davol and Bard as to Counts One, Two, Four, Six, Seven, Eight and Nine of the Second Amended Complaint, and, additionally, in favor of Defendant Bard as to Counts Three and Five. The defendant's motion for summary judgment is hereby GRANTED in favor of AHSI and Davol on their counterclaims in the amount of $99,017 as to Eclipse and $77,427 as to Horizon. The Court will withhold the entry of Final Judgment on these claims until the conclusion of this case.

The Court retains jurisdiction over these claims for the purpose of determining the parties' entitlement to attorneys fees and costs, if any, and such determination will be addressed by separate order.