**UNIVERSITY OF MIAMI, a not-for-profit, Florida corporation**
Plaintiff,

v.

**INTUITIVE SURGICAL, INC,**
**a Delaware corporation,**
Defendant.

No. 04–20409–CIV–KING.

United States District Court,
S.D. Florida,
Miami Division.

Jan. 27, 2005.

---

Eric David Isicoff, Esq., Evan Roberts, Esq., Isicoff, Ragatz & Koenigsberg, Gregory Charles Ward, Miami, FL, for Plaintiff.

Edmund T. Henry, III, Esq., Robert Gerald Fracasso, Jr., Esq., Scott William Rostock, Esq., Shutts & Bowen, Miami, FL, for Defendant.

## SUMMARY JUDGMENT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court upon cross-motions for summary judgment: Defendant's Motion for Summary Judgment (DE # 43), filed December 6, 2004;[1] and Plaintiff's Motion for Partial Summary Judgment (DE # 44), filed December 6, 2004.[2]

## I. BACKGROUND

### A. *The Agreement*

Plaintiff, University of Miami ("UM"), is a private university operating as a not-for-profit corporation with its principal place of business in Miami–Dade County, Florida. Defendant, Intuitive Surgical, Inc. ("Intuitive"), is a Delaware corporation with its principal place of business in Sunnyvale, California. Intuitive is a designer, manufacturer, and seller of robotic surgical devices, including the da Vinci surgical system (the "da Vinci System"). Prior to a merger on June 30, 2003, between Intuitive and Computer Motion, Inc. ("CMI"), CMI was also a manufacturer, designer, and seller of robotic surgical devices, including the ZEUS Micro–Wrist Robotic Surgical System (the "ZEUS System").

In 1999, UM recruited Dr. Robert Bailey, a premier laparoscopic surgeon, to set up a division and training center for minimally invasive surgery. (Pl.'s St. of Facts. at 1.) As part of this project, and in an attempt to become a leader in this newly developing field, UM sought to acquire two robotic surgical devices for use in both a clinical and a teaching-and-research setting. Starting in 1999 and continuing until the end of 2002, UM considered two robotic surgical systems: Intuitive's da Vinci System and CMI's ZEUS System. Eventually, UM decided not to purchase the da Vinci System because it was too expensive and UM believed it was too large for the intended operating rooms at UM's Sylvester Comprehensive Cancer Center. (Pl.'s Stat. of Facts at 2.)

During July 25, 2002, after an initial offer, CMI and UM began to negotiate the sale of a ZEUS System. UM was particu-

---

1. On December 23, 2004, Plaintiff filed its Response. On January 7, 2005, Defendant filed its Reply.

2. On December 23, 2004, Defendant filed its Response. On January 5, 2005, Plaintiff filed its Reply.

larly familiar with CMI's ZEUS System because Dr. Bailey served on CMI's advisory board since the early 1990's. As a member of the advisory board, Dr. Bailey was involved in the testing and development of a number of CMI robotic devices, including the ZEUS System. (Pl.'s Stat. of Facts at 2; Def.'s Stat. of Facts at 2:5.) Dr. Bailey served as the principal investigator concerning the use of a ZEUS System for laparascopic cholecystectomies and was involved in an FDA trial using the ZEUS System for Nissen Fundoplications. These successful trials helped the ZEUS system obtain FDA clearance for general surgery in 2002. (Pl.'s Stat. of Facts at 2.)

On December 31, 2002, CMI and UM executed a Purchase Agreement (the "Agreement"). Under the Agreement, CMI agreed to sell, and UM agreed to purchase, a ZEUS System for $695,000, and a Socrates Robotic Telecollaboration System ("Socrates") for $90,000. CMI also agreed to rent a second ZEUS System to UM for six months for $1 a month, and UM was granted an option to purchase the rented ZEUS System for $550,000. UM was entitled to product warranty, service, and support for one year for the purchased ZEUS System, and an option to purchase additional warranty support for an additional $95,000 per year after the first year. The Agreement also provided that CMI and UM would exert "good faith efforts" to work "collaboratively" to establish UM as a leading robotic training center. (Pl.'s Exh. 1.)

On January 7, 2003, a week after the Agreement was signed, David Stansberry, UM"s Hospital Administrator, notified CMI's president that UM intended to rescind the Agreement because UM failed to comply with its own internal policies, procedures, and guidelines for purchases. Mr. Stansberry stated that UM would reconsider the Agreement through UM's formal review process (Def.'s Exh. 12.) On or about January 21 or 22, 2003, Alan Fish, UM's Vice President for Business Services, added his signature to the Agreement, and confirmed to CMI that all of UM's procedures had been undertaken and satisfied. (Def.'s Exhs. 1, 2, 18.) Despite the extra due diligence, Thomas Fitzpatrick, UM's Chief Financial Officer, later stated in email that: "...I just found out that we could have gotten out of this deal a couple of days ago .... Now we're locked in. So now, instead of being out of this, we are stuck with a big financial problem. Still with no analysis that shows any positive rate of return!" (Def.'s Exh. 20.)

On March 3, 2003, CMI delivered to UM all of the products subject to the Agreement, including the purchased and rented ZEUS Systems and the related equipment and instruments. Subsequently, UM tested both of the ZEUS Systems and determined that they were fully operational. (Stansberry Depo. at 181:17–23; Bailey Depo. at 308:25–309:8.) In April 2003, CMI hired Sean Murtha to serve as a Clinical Development Specialist to provide on-site service, support and training to UM during the one-year warranty. Ultimately, however, UM never asked Mr Murtha to perform any tasks and UM never used the ZEUS Systems (Bailey Depo. at 292:1–5.).

B. *The Merger*

On March 6, 2003, CMI and Intuitive executed a merger agreement. On June 30, 2003, the new company (Defendant Intuitive) was formed following regulatory and shareholder approval. The merger was primarily the result of settlement negotiations concerning multiple patent infringement cases between the two companies. (Def.'s St. of Facts 6:23–8:28.)

On March 12, 2003, Intuitive's president, Lonnie Smith, wrote to the customers of both companies stating that the merged

entity's product portfolio "will include," among other things, the ZEUS System. On July 7 and 8, 2003, Intuitive held a series of meetings at UM for certain sales representatives and clinical specialists regarding robotic technology. At that time, Intuitive's Vice President for Worldwide Sales informed Dr. Bailey that Intuitive would no longer fund research and development of the ZEUS System. (Bailey Dep. at 276.) Shortly thereafter, Intuitive ceased all FDA trials using the ZEUS System and on August 7, 2003, Intuitive announced that it would no longer pursue additional FDA clearances for the ZEUS System. Since the merger was effective, no FDA trials on the ZEUS System have taken place and Intuitive has not sought to collaborate with UM on research and development initiatives. (Pl.'s St. of Facts 6–7.)

## C. *The Dispute*

On February 19, 2004, UM filed a Complaint against Intuitive (as the successor to CMI) alleging that UM was fraudulently induced to purchase an "obsolete system" and that Intuitive breached the Agreement. "The University believed it was purchasing a cutting-edge robotic surgical system that would be supported through a high-profile robotic training center with an emphasis on professional training and research. Instead, the University received a machine that was obsolete before ever being installed in an operating room." (Pl.'s Mot. at 2.) UM argues that the ZEUS System's discontinuance made the device obsolete, therefore impossible to create a training center for minimally invasive surgery around an obsolete surgical device, and CMI knew, at the time of sale, that Intuitive would discontinue the ZEUS System after the merger. (Complaint 3:12–7:35.)

In Count I, UM alleges that "Defendant breached the contract by, among other things, failing to provide a cutting-edge

robotic surgical system, by failing to support the development of a Robotic Training Center at[UM], and by discontinuing service and upgrades for the ZEUS [S]ystem." (Complaint at 7:38.) In Count VI, UM argues the same claim under a theory of promissory estoppel. In Counts II, III, IV, VI and VII (the "fraud claims"), UM alleges constructive fraud, recision, fraud in the inducement, a violation of Florida's Deceptive and Unfair Trade Practice Act, Fla. Stat. §§ 501.201–313, and conspiracy to commit fraud. These claims allege that CMI misrepresented the "superiority" of the ZEUS System; CMI misrepresented that the ZEUS System would continue to be upgraded, supported and serviced by CMI; and that CMI failed to disclose the material facts of the impending merger with Intuitive, particularly the fact that the ZEUS System would be discontinued as a result thereof.

In the instant cross-motions, UM moves for summary judgment on Count I (breach of contract) and Count II (recision) of the Complaint and Intuitive moves for summary judgment on the Complaint in its entirety.

## II. *STANDARD OF REVIEW*

Summary judgment is appropriate only where it is shown that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the record as a whole could not lead a rational fact-finder to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the

non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is no requirement that the trial judge make findings of fact. *Id.* at 251, 106 S.Ct. 2505.

The party seeking summary judgment always bears the initial burden of pointing to that part of the record which shows the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993). If the movant meets its burden, the burden then shifts to the non-moving party to establish that a genuine dispute of material fact exists. *Hairston*, 9 F.3d at 918. To meet this burden, the non-moving party must go beyond the pleadings and "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991). If the evidence relied on is such that a reasonable jury could return a verdict in favor of the non-moving party, then the court should refuse to grant summary judgment. *Hairston*, 9 F.3d at 919.

### III. DISCUSSION

#### A. Breach of Contract Claim (Count I)

 UM argues that the Intuitive breached it obligation under the Agreement to provide a "cutting-edge" robotic surgical system, "to make a good-faith effort to establish a world-class robotic surgery center at the University," and to continue to upgrade the ZEUS System. (Pl.'s Mot. at 4.) UM identifies two specific provisions of the Agreement that Intuitive allegedly breached. The first provision states:

*Robotic Training Center of Excellence.* CMI and UMSM agree to use their good faith efforts to establish UMSM as the CMI International Robotic Training Center of Excellence for the South East under the following terms:

- Establish UMSM Robotic Training Center of Excellence as the international standard across disciplines through minimally invasive robotic clinical research, surgical innovation, training, education and total patient care
- Develop Robotic Residency Fellowships Program
- Co-develop targeted multi-specialty endoscopic procedures
- Jointly market Certified Robotic Training Courses
- Implement mutually agreed upon Research and Development Initiatives through joint engineering collaboration on new procedures ...
- Launch regional, national, and international public relations programs ...

(Pl.'s Exh. at ISI 0035.)

Intuitive is entitled to summary judgment as a matter of law on this breach of contract claim because UM has produced no evidence in support of its contention that Intuitive failed to collaborate to establish UM as a robotic training center. UM has not produced evidence of a single instance in which UM made any request, and CMI or Intuitive refused or was unwilling, to collaborate on a UM training center. While the language of the contract contemplates future projects to be jointly developed by both parties, it does not place the burden of development or collaboration on Intuitive. The fact that UM decided not to use the ZEUS System does not place Intuitive in breach of the contract. UM cannot unilaterally cause Intuitive to breach the agreement by forgoing the fruits of the contract. Finally, the record shows that Intuitive retained Sean Murtha to serve as the CDS for UM, and that Mr. Murtha was never called upon by UM for training or technical support. Accordingly, the evidence demon-

strates that Intuitive did not refuse to engage in good faith efforts to create a training center.

■ The second provision that Intuitive allegedly breached reads in full:

Computer Motion, Inc. ("CMI") and University of Miami School of Medicine ("UMSM") agree to use their good faith efforts to establish UMSM as CMI's Robotic Training Center of Excellence for the South East by working collaboratively toward the goals and implementation outlined herein:

**Participation in Clinical Trials/Studies**

As we jointly create a Discipline Development Plan, opportunities may arise regarding participation in ongoing and/or new clinical trials/studies. To ensure UMSM meets CMI's selection criteria for its/investigators, CMI reserves the right to meet and discuss with the UMSM clinical representative(s), surgeons and staff and review such opportunities. Upon review and acceptance, by CMI's Department of Clinical Affairs, and depending upon availability of open slot in the clinical trial (s) of interest, CMI will provide UMSM the opportunity to participate.

(Pl.'s Exh. 1 at ISI 0045.) UM alleges that Intuitive breached this contract clause by failing to develop any future upgrades of the ZEUS System because UM lost the opportunity to participate in future clinical trials and studies.

UM's breach of contract claim fails because there was no requirement in the contract that CMI was obligated to develop future upgrades for the ZEUS System. The only relevant provisions actually touching upon future upgrades stated that UM would be entitled to "[a]ll product software upgrades at no charge during the

warranty, service and support term," and that "[a]ny additional requested hardware upgrades shall be provided to UMSM at 75% of the current U.S. List Price." Mr. Stansberry, the Executive Director of UM's Hospital Division, testified that he could not say what upgrades CMI was obligated to develop, how much CMI had to spend to develop such upgrades, or when such upgrades were required to be developed.[3] (Stansberry Depo. at 297:24–299:9.) Further, Mr. Stansberry testified that should CMI have developed product upgrades, UM was under no obligation to purchase any of them. (Stansberry Depo. at 289:12–290:04.)

Clearly, the above-contested contract provision did not create an obligation for CMI to continue to upgrade the ZEUS System. Indeed, there is nothing in the contract that obligated CMI to even continue manufacturing the ZEUS System, or to prevent CMI from inventing a new robotic surgical device that made the ZEUS System obsolete. Inasmuch as UM was aware (based on Dr. Bailey's intimate knowledge of this developing technological filed) that any robotic surgical device could quickly become obsolete, UM could have negotiated a contract that affirmatively required CMI to continue manufacturing the ZEUS System and to continue producing upgrades. UM did not, and the clause at issue does not do so.

■ Finally, UM cannot establish that Intuitive breached the agreement by failing to provide a "cutting-edge" robotic surgical system. Under the Agreement, Intuitive was obligated to deliver to UM two ZEUS Systems and a Socrates, including certain related equipment and instruments. The equipment purchased by UM is precisely enumerated in the Agreement

---

**3.** The failure to place any time line on future upgrades is significant because the Agreement

had only a year-long life span and expired on December 31, 2002. (Pl.'s Exh. 1.)

and UM was very familiar with the ZEUS Systems because Dr. Bailey was on CMI's advisory board for ten years. UM does not dispute that all the equipment enumerated in the contract was delivered. Hence, Intuitive fulfilled its obligations under the Agreement with respect to delivery of the purchased equipment.

### B. *Fraud Claims (Counts II, III, IV, VI and VII)*

█ UM has asserted five separate claims that are grounded in fraud. Specifically, UM contends that CMI knew that, in the future, it was going to merge with Intuitive and that the merged company, following the future merger, would decide not to develop future upgrades for the ZEUS System. Based on the Court's conclusion that Intuitive did not breach the Agreement, UM cannot maintain any actions for fraud against Intuitive.

Additionally, Intuitive has submitted evidence that as of December 31, 2002 (the date of the signing of the Agreement), all settlement/merger discussions had ceased between CMI and Intuitive for over eight weeks, and that settlement/merger discussions did not resume until January 27, 2003. Intuitive has also offered testimony that prior to June 20, 2003, the date on which the CMI and Intuitive merger was approved by the shareholders of each company, there had been no decision about whether the merged entity would or would not develop future upgrades for any products, including the ZEUS System, or whether the ZEUS System would be discontinued. UM has presented no contrary evidence regarding the timing or substance of the merger discussions.[4]

### C. *Promissory Estoppel Claim*

█ UM cannot establish a claim for promissory estoppel because that equitable doctrine is unavailable when there is a written contract between the parties covering the disputed promises. *Eclipse Med., Inc. v. American Hydro–Surgical Instruments, Inc.,* 262 F.Supp.2d 1334, 1351 (S.D.Fla.1999); *Mobil Oil Corp. v. Dade Cty. Esoil Mgmt. Co., Inc.,* 982 F.Supp. 873, 880 (S.D.Fla.1997); *Advanced Mktg. Systs. Corp. v. ZK Yacht Sales,* 830 So.2d 924, 928 (Fla. 4th DCA 2002). The rationale underlying this prohibition is that " '[p]romissory estoppel is not a legal doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract'." *Advanced Mktg. Systs. Corp.,* 830 So.2d at 928 (citing *General Aviation, Inc. v. Cessna Aircraft Co.,* 915 F.2d 1038, 1042 (6th Cir.1990)). In the instant case, UM's claim for promissory estoppel is merely a restatement of its claim for breach of contract.

### IV. *CONCLUSION*

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is ORDERED and ADJUDGED that Defendant's Motion for Summary Judgment be, and the same is hereby, GRANTED, all other motions are denied as moot. The case is DISMISSED, with jurisdiction retained for assessment of fees and costs if appropriate.

---

**4.** The Court also notes that the merger between CMI and Intuitive probably was not a surprise to UM. Intuitive has presented evidence that UM, in fact, independently concluded that the patent litigation between CMI and Intuitive might be resolved through a merger. (Def.'s Exh. 19; Stansberry Depo. at 173:20–22, 147:12–17, 175:1–3, 175:6–12, 177:13–19; Bailey Depo. at 287:13–288:6.)